# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| SEVEN SEAS PETROLEUM, INC., | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-3048 |
| | § | |
| CIBC WORLD MARKETS, CORP, | § | |
| | § | |
|     Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendant CIBC World Markets, Inc.'s ("CIBC's") Motion to Dismiss [Doc. # 42] ("Motion"). Plaintiff Seven Seas Petroleum, Inc. ("Seven Seas," or the "Company") filed a Response [Doc. # 46] and CIBC filed a Reply [Doc. # 47]. Having considered the parties' submissions, applicable legal authorities, and all pertinent matters of record, the Court **denies** the Motion to Dismiss.

## I.     FACTUAL BACKGROUND

### A.     Seven Seas' Bankruptcy[1]

Seven Seas was an oil and gas exploration company with operations focused in the Guaduas Fields (the "Fields") in Columbia, South America.  Seven Seas lost money on these operations between 1995 and 2000.  Plaintiff's Second Amended Complaint alleges that by early to mid-2001, Seven Seas was insolvent from both liquidity and balance sheet perspectives and that it was evident to the Directors of Seven Seas and other Company insiders that, absent additional funding, Seven Seas would have to file bankruptcy by late 2001.

Seven Seas accordingly sought to raise additional funds in an effort to continue operations.  Plaintiff alleges that it hired CIBC in 2001 to serve as Seven Seas' exclusive financial advisor, to assist in raising these additional funds, and to render a fairness opinion in connection with any potential financing transaction.  Ultimately, Seven Seas reached an agreement with Chesapeake Energy Corporation ("Chesapeake") to issue $45 million senior, secured notes (the "Secured Facility"), $22.5 million of which would be purchased by Chesapeake and $22.5 million of

---

[1]     This background is drawn from the Court's Memorandum and Order [Doc. # 37] ("First Memorandum and Order") granting in part and denying in part CIBC's first motion to dismiss [Doc. # 13].  For additional background facts, see the First Memorandum and Order.

which would be purchased by a group of Seven Seas' insiders (the "Insiders").[2] These senior, secured notes were to be secured by substantially all of Seven Seas' assets. At a May 17, 2001, meeting, having received a preliminary opinion from CIBC that the Secured Facility was fair from a financial point of view, the Seven Seas' board of directors authorized Seven Seas to issue the senior, secured notes. On July 23, 2001, CIBC issued a final written fairness opinion regarding the transaction. The Secured Facility closed the following day.

Seven Seas used the $45 million to develop its proven reserves in the shallow portions of the Fields and to drill the Escuela 2 well in the deep Fields. These exploration and development efforts proved unsuccessful. Seven Seas' reserve engineering firm subsequently reduced Seven Seas' reserve estimates by sixty-six percent. The combination of poor financial performance and the reserve write-down pushed Seven Seas to announce in November 2002 that it would likely cease operation in late 2002 or early 2003. Seven Seas began implementing a wind-down strategy at Chesapeake's request, which included a plan to sell Seven Seas' rights to the shallow Fields. On December 20, 2002, a group of senior noteholders filed an involuntary

---

[2]     The group of insiders included four of the seven directors on Seven Seas' board of directors.

Chapter 7 bankruptcy petition against Seven Seas.  Seven Seas subsequently filed its own petition under Chapter 11.

### B.   Seven Seas' Relationship with CIBC

The following factual recitation is drawn from Seven Seas' Second Amended Complaint [Doc. # 41].  Seven Seas alleges that it retained CIBC to assist it in raising funds and as its "exclusive financial advisor to provide advice and assistance in connection with [Seven Seas'] financing search and future operations."[3]  Seven Seas alleges that it hired CIBC not just as investment banker, but to serve "multiple roles," including providing "sophisticated financial and operational advice," which Seven Seas contemplated would be relied upon by its management and board of directors.[4] Seven Seas hired CIBC pursuant to an Engagement Letter setting forth the services that CIBC was to provide, which included:

> (i) providing an assessment and review of the Company's business and operations, its historical and projected financial condition and its near and long term-business objectives and capabilities; (ii) assisting the Company in formulating financial strategies and procedures for achieving one or more of its financial objectives and alternatives; and (iii) advising the Company as to the timing, structure and pricing of one or more of the Company's financial alternatives or potential financing facilities.[5]

---

[3]     SAC, ¶ 17.

[4]     *Id.*

[5]     *Id.*, ¶ 18.

Under the terms of the Engagement Letter, if Seven Seas decided to pursue debt or equity financing, CIBC represented that it would assist the Company by:

> (a) reviewing financial information and supporting data related to a potential financing, (b) preparing presentation materials related to a financing, (c) conducting the relevant financial analysis for the contemplated financing, (d) providing the debtor with negotiating support and advice, (e) identifying and communicating with the Debtor's potential investors, and (f) assisting with the preparation and drafting of legal documents and an information memorandum for potential investors.[6]

CIBC also promised to issue a fairness opinion with regard to any potential financing transaction contemplated by Seven Seas, if requested.[7]  In return for its financial advice and services, Seven Seas agreed to pay CIBC a monthly fee for services rendered, a fee for a fairness opinion if such was rendered, and a "success fee" upon the closing of any financial transaction.[8]  In the Second Amended Complaint, Seven Seas alleges that all of the financial advisory services contemplated in the Engagement Letter were actually provided by CIBC, and that Seven Seas relied

---

[6]    *Id.*, ¶ 19.

[7]    *Id.*

[8]    *Id.*

upon CIBC's advice and services, which influenced the Company's management and board of directors.[9]

Seven Seas alleges that it retained CIBC as its exclusive financial advisor because CIBC had an "extremely close and extensive relationship with [Seven Seas] and its management," and had "access to highly confidential financial and non-financial information that was not available to the public."[10]  CIBC had served as an underwriter on a previous offering by Seven Seas of senior unsecured notes, and "had provided extensive consulting services to [Seven Seas] before CIBC's 2001 retention, which included providing operational and financial advice to [Seven Seas] at [Seven Seas'] board of director meetings.[11]

CIBC recommended that Seven Seas enter into the $45 million Secured Facility with Chesapeake and the group of Seven Seas Insiders.[12]  Under the Secured Facility, Chesapeake and the Insiders would each loan Seven Seas $22.5 million on a secured basis for a total of $45 million.[13]  In return, Chesapeake and the Insiders would receive several thousand detachable warrants, which, if exercised, would allow for the

---

[9]      *Id.*

[10]     *Id.*, ¶ 20.

[11]     *Id.*

[12]     *Id.*, ¶ 21.

[13]     *Id.*

6

purchase of up to 40 percent of Seven Seas' shares.[14]  These detachable warrants, which were priced below the trading price of Seven Seas' stock at the time of issuance, "were considered crucial to the Secured Financing because they allowed Chesapeake and the Insiders to increase their ownership position in the [Seven Seas] if the Company's Escuela 2 well was successfully drilled.[15]  Seven Seas alleges that from the perspective of the Directors, the Secured Facility was a "no-lose investment," because if the Escuela 2 well was successful, they could exercise their warrants and "cash in on the Company's contemplated soaring stock price."[16]  If the well was not successful, and Seven Seas filed bankruptcy, the Directors' investment would be protected by their secured position in the Company.[17]

Seven Seas alleges that the Directors and CIBC were in possession of confidential studies, conducted by outside consultants and Seven Seas' staff, that indicated that the Escuela 2 well's chances of success were "extremely remote."[18]  Nevertheless, in early 2001, Seven Seas announced that it had reached a tentative agreement with Chesapeake requiring Chesapeake and the Insiders to fund the

---

[14]    *Id.*, ¶ 22.

[15]    *Id.*

[16]    *Id.*, ¶ 24.

[17]    *Id.*

[18]    *Id.*, ¶ 25.

Secured Facility.[19]  Shortly thereafter, Seven Seas requested a fairness opinion from CIBC regarding the transaction.[20]  Because of a provision in an Indenture on the Company's $110 million Senior Unsecured Notes, a fairness opinion was required before Seven Seas could consummate the Secured Facility.[21]  Further, because a majority of Seven Seas' directors were interested parties in the Secured Facility transaction, certain board members believed that CIBC was "also acting in the role of a special committee."[22]

Seven Seas board of directors considered a resolution to authorize the Company to enter the Secured Facility at the May 17, 2001 board meeting.[23]  CIBC attended the meeting and made a presentation recommending that Seven Seas enter the Secured Facility.[24]  Seven Seas alleges that "CIBC also recommended that the Company forgo all other going-forward strategies and options."[25]  Following CIBC's recommendation,

---

[19]     *Id.*, ¶ 27.

[20]     *Id.*

[21]     *Id.*

[22]     *Id.* n.5.

[23]     *Id.*, ¶ 27.

[24]     *Id.*

[25]     *Id.*

Seven Seas' Directors voted to authorize the transaction.[26]  Prior to making this recommendation, CIBC provided Seven Seas with a detailed analysis and evaluation of the Company's "operations, financial position, and financial options."[27]  CIBC also provided advice on the structure of the financing, including how much consideration should be provided for the Secured Facility, and the pricing and structuring of the warrants.[28]  CIBC also performed valuations of Seven Seas at different points in time, including a "status quo scenario where the $45 million secured financing was not authorized and other scenarios when it was consummated."[29]  "Finally, CIBC assisted the Company in its negotiations with the Chesapeake before the final terms of the financing were approved and before CIBC issued its written fairness opinion."[30]

Seven Seas alleges that, though it, and certain of its board members relied on CIBC's advice and its fairness opinion, CIBC was not truly disinterested and independent.[31]  CIBC received a success fee upon the consummation of the Secured

---

[26]     *Id., ¶* 28.  Though in violation of the Company's Articles of Association, all four interested directors voted in favor of entering the Secured Facility.

[27]     *Id.*

[28]     *Id.*

[29]     *Id.*

[30]     *Id.*

[31]     *Id.*, ¶ 29.

Facility, and "was also likely to (and did) receive future engagements from the Directors for facilitating the Directors' participation in a potentially lucrative transaction, in which the Directors perceived they had no down side risk."[32]

In May 2001, Seven Seas applied for and obtained an exemption from the American Stock Exchange ("AMEX") that relieved the board of directors from their obligation to obtain shareholder approval of the Secured Facility.[33] "This exemption was obtained with the assistance of CIBC. In applying for the exemption, Seven Seas represented to AMEX that the shareholder vote was unnecessary because CIBC would provide a fairness opinion on the transaction.[34]

Seven Seas alleges that the minutes from a March 17, 2001 board meeting indicated that the Company had no equity value at that time.[35] Accordingly, CIBC knew or should have known that Seven Seas was insolvent at that time.[36] However, despite this financial condition, CIBC did not recommend alternative courses of action to the $45 million Secured Facility that would have been (or were) available at the

---

[32]     *Id.*

[33]     *Id.*, ¶ 30.

[34]     *Id.*

[35]     *Id.*, ¶ 31.

[36]     *Id.*

time.[37]  Instead, Seven Seas alleges, CIBC issued a "rubber stamp fairness opinion that CIBC knew or should have known was defective, false and incorrect."[38]  Seven Seas further alleges that CIBC "concealed crucial and material information regarding the Company, the production capabilities of the Fields and the remote likelihood of success of the Escuela 2 well that, if disclosed, would have resulted in making the transaction impossible to consummate under the Indenture or that would have resulted in innocent parties stepping forward" to stop the Secured Facility.[39]

After the subsequent failure of the Escuela 2 well and the Fields, and the ensuing financial difficulties, Seven Seas implemented a wind-down strategy at Chesapeake's request, which included a plan to sell Seven Seas' rights to the shallow Fields. [40]  Seven Seas alleges that, "[p]erhaps as a reward for providing a fairness opinion that CIBC knew (or should have known) was false and defective, the Company retained CIBC to market the Fields and to administer the auction process."[41]

---

[37]     *Id.*, ¶ 32.

[38]     *Id.*

[39]     *Id.*, ¶ 33.

[40]     *Id.,* ¶ 36.

[41]     *Id.*

The Fields were eventually sold for "substantially less than their fair market value," and CIBC received a "substantial success fee" upon the consummation of the sale.[42]

### C.    <u>The Instant Litigation</u>

On October 14, 2010, Ben Floyd, then Chapter 11 trustee for Seven Seas, filed the instant suit against CIBC and CIBC World Markets, Inc., bringing claims for aiding and abetting the Directors' breach of fiduciary duties and breach of CIBC's own fiduciary duty.  *See* Original Complaint [Doc. # 1].  Floyd subsequently filed an Amended Complaint [Doc. # 5] adding claims for negligence, gross negligence, fraud, and negligent misrepresentation.  Following a Motion to Dismiss [Doc. # 13], the Court dismissed the claims against CIBC World Markets, Inc. *See* Memorandum and Order [Doc. # 37].  The Court also dismissed Plaintiff's negligence and negligent misrepresentation claims with prejudice and dismissed the breach of fiduciary duty and fraud claims with leave to amend.  Seven Seas subsequently repled these claims in its Second Amended Complaint, which also includes claims for aiding and abetting the Directors' breach of fiduciary duty and gross neligence.  CIBC now moves to dismiss Seven Seas' breach of fiduciary duty, fraud, and conspiracy claims.  The Court denies CIBC's Motion.

### II.    <u>RULE 12(b)(6) STANDARD</u>

---

[42]    *Id.*

Traditionally, courts hold that a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim is viewed with disfavor and is rarely granted. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009); *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005). The Supreme Court has explained that in considering a motion to dismiss under Rule 12(b)(6), a complaint must be liberally construed in favor of the plaintiff and all well-pleaded facts taken as true. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[A] judge must accept as true all of the factual allegations contained in the complaint." (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (internal citations omitted))). Nevertheless, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 120 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555). Legal conclusions "are not entitled to the assumption of truth." *Id.* at 1950. Legal conclusions "can provide the framework of a complaint," but they must be supported by factual allegations. *Id.*[43]

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*,

---

[43]   "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 120 S. Ct. at 1949.

129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 556). The determination of "whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting FED. R. CIV. P. 8(a)(2)).[44] "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citations omitted). It is insufficient to plead facts that are "merely consistent with" a defendant's liability. *See Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557).

---

[44]     "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556).

In considering a motion to dismiss, a court ordinarily must limit itself to the contents of the pleadings and attachments thereto.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (citing FED. R. CIV. P. 12(b)(6)).  "Documents that a defendant attaches to a motion to dismiss are [also] considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."  *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)); *see also Kane Enters. v. MacGregor (USA), Inc.*, 322 F.3d 371, 374 (5th Cir. 2003).  "In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated."  *Collins*, 224 F.3d at 499.  These are documents presumably whose authenticity no party questions.

## III.   ANALYSIS

### A.   Breach of Fiduciary Duty

CIBC argues that Plaintiff's Second Amended Complaint, like its Amended Complaint, fails to state a claim for breach of fiduciary duty because it does not allege facts sufficient to establish that a fiduciary relationship existed between CIBC and Seven Seas.  Seven Seas counters that it has added new factual allegations in the Second Amended Complaint, which when combined with allegations previously pled, are sufficient to establish a fiduciary relationship.

As set forth in the Court's Memorandum and Order [Doc. # 37] on CIBC's first Motion to Dismiss, "[t]he existence of a fiduciary relationship, outside of formal relationships that automatically give rise to fiduciary duties, is usually a fact intensive inquiry." *ARA Automotive Group v. Cent. Garage, Inc.*, 124 F.3d 720, 723 (5th Cir. 1997). Under both New York and Texas law, a fiduciary relationship exists when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship. *See Muller-Paisner v. TIAA*, 289 F. App'x 461, 465 (2d Cir. 2008) (quoting *Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 599 (2d Cir. 1991)); *ARA Automotive*, 124 F.3d at 723 (quoting *Tex. Bank & Trust Co. v. Moore,* 595 S.W.2d 502, 507 (Tex. 1980)).

Generally, financial advisors such as investment banks do not stand in a fiduciary relationship with their clients. *See, e.g., Ciccone v. Hersh*, 530 F. Supp. 2d 574, 577–78 (S.D.N.Y. 2008); *In re e2 Commc'ns, Inc.*, 354 B.R. 368, 392–94 (Bankr. N.D. Tex. 2006); *see also Joyce v. Morgan Stanley & Co., Inc.*, 538 F.3d 797, 802 (7th Cir. 2008); *JPMorgan Chase Bank, N.A. v. IDW Group, LLC*, 2009 WL 321222, at *8–*9 (S.D.N.Y. Feb. 9, 2009) (a fiduciary relationship is necessarily "grounded in a higher level of trust than normally present in the marketplace between those involved in arms' length business transactions.") (citing *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005)).

Construing the complaint liberally in favor of the pleader, and accepting all well-pleaded facts as true, the Court concludes that it cannot hold that Seven Seas fails to state a claim for breach of fiduciary duty that is plausible on its face under either New York or Texas law.[45] *See Iqbal*, 129 S. Ct. at 1949.  Although investment banks generally do not stand in fiduciary relationships with their clients, "New York courts have found fiduciary relations between clients and investment banks where there is either a confidence reposed which invests the person trusted with an advantage in treating the person so confiding or an assumption of control and responsibility." *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Securities Corp.*, 351 F. Supp. 2d 79, 102 (S.D.N.Y. 2004) (internal quotations and citations omitted).  In *American Tissue*, the court found that the complaint "repeatedly emphasize[d] the extent of [the investment bank's] penetration of [the client's] finances and management, the extraordinary trust it reposed in [the investment bank], and its reliance on [the investment bank's] advice and due diligence in connection with the bond offering and related transactions," and, therefore, the court denied a motion to dismiss because it could not say as a matter of law that no fiduciary duty existed. *Id.*        Similarly, in *Official Committee of*

---

[45]    As described in the Memorandum and Order granting in part and denying in part CIBC's first motion to dismiss, the Court cannot make a choice of law determination on the current record.  Accordingly, at this point in the proceeding, the Court analyzes the adequacy of Seven Seas' pleading of its breach of fiduciary claim under the laws of both New York and Texas.  Memorandum and Order [Doc. # 37], at 28**.**

*Unsecured Creditors v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 2002 WL 362794, at *9–*10 (S.D.N.Y. Mar. 6, 2002), the district court held that a fiduciary relationship can arise within certain investment banking contexts.  In *Official Committee*, the financial advisor investment bank was held to have a fiduciary relationship with the client because the investment bank's duties included evaluating the company and its operations, advising the company on a proposed purchase price and form of consideration, assisting the company in structuring the transaction and negotiating the financial aspects of the transaction.  Moreover, the complaint specifically alleged that the investment bank accepted the trust and confidence placed in it by the company as the investment bank was an entity with superior knowledge and was in a superior position to exert unique influence over the company.  *See also Frydman & Co. v. Credit Suisse First Boston Corp.*, 708 N.Y.S.2d 77, 79 (N.Y. App. Div. 2000); *Wiener v. Lazard Freres & Co.*, 672 N.Y.S.2d 8, 12 (N.Y. App. Div. 1998) (both finding that a claim for breach of fiduciary duty was sufficiently pled to survive a motion to dismiss in the investment banking context when plaintiffs alleged, *inter alia*, that the investment bank negotiated on their behalf).

In the case at bar, Seven Seas has pled sufficient facts to demonstrate a plausible claim that its relationship with CIBC was "grounded in a higher level of trust than normally present in the marketplace between those involved in arms' length

business transactions." *See JPMorgan Chase Bank, N.A.*, 2009 WL 321222, at *8–*9.

The Second Amended Complaint alleges that CIBC provided a variety of sophisticated financial advice to Seven Seas prior to recommending the Secured Facility, including valuing the Company under scenarios in which Seven Seas pursued the transaction and scenarios in which it did not, as well as "assist[ing] the Company in its negotiations with the Chesapeake before the final terms of the financing were approved and before CIBC issued its written fairness opinion."[46]  Seven Seas alleges that CIBC recommended that the Company enter into the Secured Facility and reject all other "going forward strategies and options."[47]

Plaintiff has plead that, because of its corporate governance requirements, it could not proceed with the deal without CIBC's fairness opinion, and that, because of this requirement, "CIBC played an even more pivotal role in [the Secured Facility's] approval than the Directors."[48]  Plaintiff also has plead that CIBC assisted Seven Seas' directors in obtaining an AMEX exemption that allowed the board to consummate the deal without shareholder approval, and that in obtaining the

---

[46]     SAC, ¶ 28.

[47]     SAC, ¶¶ 27-28.

[48]     *Id.*, ¶ 29.

exemption, the Company represented to AMEX that shareholder approval was unnecessary because CIBC would provide a fairness opinion.

Plaintiff also alleges that because the majority of the board was interested in the Secured Facility transaction, certain board members believed that CIBC was functioning as a special committee.  Although Plaintiff concedes that CIBC in fact was not designated as a formal special committee, certain board members' belief that it was so appointed is probative of an unusually close, intertwined relationship between CIBC and Seven Seas.

Finally, the Second Amended Complaint alleges that CIBC's advice was not disinterested and independent because CIBC stood to receive a success fee or bonus upon consummation of the secured facility and was also likely to, and in fact did, receive future engagements from the Directors who viewed the secured facility as a potentially lucrative transaction.

Construed liberally in favor of Seven Seas, these allegations, taken together, demonstrate a plausible claim that CIBC penetrated Seven Seas' finances and management, and that Seven Seas had reposed an extraordinary trust and reliance on CIBC's advice.  *See  Am. Tissue*, 351 F. Supp. 2d at 102;  *Official Committee,* 2002 WL 362794, at *9–*10.  Seven Seas has pled sufficient facts in support of its breach of fiduciary duties claims to "raise a right to relief above the speculative level, on the

assumption that all the allegations in the complaint are true (even if doubtful in fact)."
*See Twombly*, 550 U.S. at 555 (internal citations omitted).   The Court, therefore,
cannot conclude as a matter of law on the basis of allegations in the Second Amended
Complaint that Plaintiff cannot state a claim for breach of fiduciary duty against
CIBC.   Discovery is necessary to determine the extent of CIBC's relationship with
Seven Seas during the relevant time period.   *JP Morgan Chase Bank*, 2009 WL
321222, at *9 ("Because the inquiry as to whether a fiduciary relationship exists is
necessarily fact-specific, a claim alleging the existence of a fiduciary duty is usually
not subject to dismissal under Rule 12(b)(6)." (internal citations and quotations
omitted)).

 The breach of fiduciary duty claims in Plaintiff's Second Amended Complaint
also survive a motion to dismiss under Texas law.   Under Texas law, fiduciary duties
arise as a matter of law in certain formal relationships.   *See Crim Truck & Tractor Co.
v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 593–94 (Tex. 1992).   The
relationship between Plaintiff and CIBC does not fall into any of the formally
recognized categories.   Apart from these formal relationships, fiduciary duties can
arise informally.   "The law recognizes the existence of confidential relationships in
those cases 'in which influence has been acquired and abused, in which confidence
has been reposed and betrayed.'"   *Associated Indem. Corp. v. CAT Contracting, Inc.*,

964 S.W.2d 276, 288 (Tex. 1998) (quoting *Crim Truck*, 823 S.W.2d at 594)).  "To impose an informal fiduciary duty in a business transaction, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit." *Associated Indem. Corp*, 964 S.W.2d at 288.  In addition to alleging that CIBC penetrated Seven Seas finances and management, and that Seven Seas reposed an extraordinary trust and reliance on CIBC's advice as detailed above, Seven Seas also alleges that CIBC was selected "to serve as the Company's exclusive financial advisor because CIBC had an extremely close and extensive relationship with [Seven Seas] and its management and was intimately familiar with the Company's personnel, operations and capital structure."[49]  Specifically, with regard to Seven Seas' prior relationship with CIBC, the Second Amended Complaint alleges that "CIBC served as an underwriter for [Seven Seas'] previous public offering of Senior Unsecured Notes and had provided extensive consulting services to [Seven Seas] before CIBC's 2001 retention, which included providing operational and financial advice to [Seven Seas] at [Seven Seas'] board of director meetings."[50]  As with Seven Seas' claims under New York law, the Court cannot conclude at this stage

---

[49]      SAC, ¶ 20.

[50]      *Id.*

of the case that Seven Seas' breach of fiduciary duty claims under Texas law fail as a matter of law.  *See Twombly*, 550 U.S. at 555

B.    **Fraud**

Under New York and Texas law, the elements of a fraud cause of action are: (1) a material representation was made; (2) it was false when made; (3) the speaker either knew it was false, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result.  *See Crigger v. Fahenstock & Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006); *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 563 n.3 (5th Cir. 2002) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex.1998)).

CIBC argues that Plaintiff has failed to plead fraud with sufficient particularity to satisfy the requirements of Federal Rule of Civil Procedure 9(b).  Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  FED. R. CIV. P. 9(b); *see Leatherman v. Tarrant Cty. Narcotics Intelligence Unit*, 507 U.S. 163, 168–69 (1993); *Hart v. Bayer Corp.*, 199 F.3d 239, 247 n.6 (5th Cir. 2000).  In particular, the pleadings should "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were

fraudulent." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004) (quoting *Williams v. WMX Technologies, Inc.*, 112 F.3d 175, 177–78 (5th Cir. 1997)).  The purpose of Rule 9(b) is to provide defendants adequate notice of the nature and grounds of the claim.  *See Hart*, 199 F.3d at 247 n.6.  "Put simply, Rule 9(b) requires the 'who, what, when, where, and how' to be laid out." *Benchmark Elecs.*, 343 F.3d at 724.  Plaintiff meets this standard in the Second Amended Complaint.

As noted in the Court's previous Memorandum and Order, the allegation that CIBC represented in the fairness opinion letter that the Secured Facility was "fair" to Seven Seas from a financial point of view, when in fact the transaction allegedly was not, is sufficient to satisfy the who, what, when and where requirements of Rule 9(b). The Second Amended Complaint also alleges that, at the time when it made this representation, CIBC knew, or should have known, that its fairness opinion was "incorrect and false and that certain representations or omissions in its fairness opinion made the opinion false or misleading."[51]  This allegation, particularly when taken in combination with the allegations that CIBC was aware that Seven Seas was financially troubled and that the Escuela 2 well was very unlikely to succeed, is sufficient to satisfy the requirement  that Plaintiff show "how" the representations

---

[51]      SAC, ¶ 50.

were fraudulent.  Although Plaintiff will maintain the burden of proving that CIBC made fraudulent representations going forward in this case, including that it knew its representations were false or that it lacked knowledge as to their truth, the Court cannot conclude that fraud cannot be proven at this stage in the case.  Seven Seas' fraud claim is pled with sufficient particularity to meet the requirements of Rule 9(b) and is thus not subject to dismissal at this time.  *See Benchmark Elecs.*, 343 F.3d at 724.

### C.   Conspiracy

CIBC next moves to dismiss Seven Seas' conspiracy claim.  CIBC first argues that this is a new claim added in the Second Amended Complaint after the deadline for amendments to pleadings.  CIBC notes that Seven Seas never sought leave to add a conspiracy claim and argues that Seven Seas lacks good cause for such an amendment after the deadline,[52] and that the conspiracy claim must therefore be dismissed.  The Court disagrees.

Seven Seas added the word "conspiracy" to the heading of Count 1 of the Second Amended Complaint as follows: "Aiding and Abetting the Directors'

---

[52]   Under the Court's Docket Control Order [Doc. # 18], the deadline for amendments to pleadings was May 15, 2009.

Breaches of Fiduciary Duties/*Conspiracy*."[53]   The factual allegations contained in Count 1 are otherwise substantially similar to those included in the previous complaint.[54]  Further, in its Response to CIBC's first Motion to Dismiss, Seven Seas referred to a conspiracy claim stating "[t]he Trustee's aiding and abetting breach of fiduciary duty claim *and conspiracy to commit breach of fiduciary duty claim* do not require a showing of reliance on the part of the Directors of the Company."[55]  The Court holds, therefore, that Seven Seas provided adequate notice of its conspiracy claim in its previous pleading and Response to CIBC's first Motion to Dismiss to satisfy the requirements of Rule 8(a).[56]

---

[53]    SAC, at 12 (emphasis added).

[54]    *See* Amended Complaint [Doc. # 5], ¶¶ 39-42.

[55]    Response to First Motion to Dismiss [Doc. # 19], at 28.

[56]    In the alternative, the Court finds that good cause exists to allow Seven Seas to add its conspiracy claim after the deadline for amendments to pleadings under Rule 16(a). *See* FED. R. CIV. P. 16; *Marathon Fin. Ins., Inc. v Ford Motor Co.*, 591 F.3d 458, 470 (5th Cir. 2009).  While Seven Seas did not expressly refer to a conspiracy claim in its Amended Complaint, it included factual allegations that could give rise to such a claim.  The amendment is clearly important to Seven Seas' theory of the case. Further, because the factual allegations underpinning the conspiracy claim were included in the Amended Complaint and are similar, or the same, as the allegations supporting the aiding and abetting claim, there appears to be no prejudice to CIBC in allowing the amendment.  This is particularly true in light of the notice provided by Seven Seas' express reference to a conspiracy claim in its Response to the first Motion to Dismiss filed on March 16, 2009.

CIBC next argues that the conspiracy claim should be dismissed under Rule 12(b)(6) as insufficiently pled to state a plausible claim for relief.  CIBC argues that Seven Seas has failed to allege that there was a "meeting of the minds" between CIBC and the Directors to breach any purported fiduciary duties of the Directors. Allegations of parallel conduct combined with a conclusory allegation of agreement, CIBC notes, are insufficient to state a claim for conspiracy.  *See Twombly*, 550 U.S. at 557.  Seven Seas' conspiracy claim, CIBC contends, must therefore be dismissed.

The Court is not persuaded.  Seven Seas' Second Amended Complaint includes the following allegation:

> As the exclusive financial advisor to the Company and its board of directors, CIBC was aware of the Directors' fiduciary duties of care, loyalty, and candor to the Company.  By issuing a fairness opinion that it never should have rendered and that was incorrect, by helping the interested directors to conceal material information regarding the Secured Facility that likely would have prevented the transaction from occurring and by undertaking the other actions described above, CIBC knowingly and intentionally aided and abetted the Directors' breaches of fiduciary duties and/or conspired with the Directors to breach the Directors' fiduciary duties. . . .[57]

The allegation that CIBC was aware of the Directors' duties to the Company and helped the interested directors conceal material information is more than an allegation of parallel conduct.  It is an allegation of concerted activity which necessarily implies

---

[57]     SAC, ¶ 43.

an agreement between the parties to the concealment activity.  Seven Seas' conspiracy claim is sufficiently pled under *Twombly* to state a plausible claim for relief.  *See Twombly*, 550 U.S. at 557.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, CIBC's Motion to Dismiss [Doc. # 42] is **DENIED**.

SIGNED at Houston, Texas, this **<u>4th</u>** day of **June, 2010**.

Nancy F. Atlas
United States District Judge