## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| SEVEN SEAS PETROLEUM, INC., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-3048 |
| | § | |
| CIBC WORLD MARKETS CORP. | § | |
| Defendant. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Seven Seas Petroleum, Inc. ("Seven Seas" or "Company") filed this lawsuit against Defendants CIBC World Markets Corp. ("CIBC"). The case was tried to the Court for nine days beginning January 14, 2013. Each party presented exhibits, deposition testimony, and live witnesses. Having considered the evidence introduced by the parties, all matters of record in this case, the arguments of counsel, and applicable legal authorities, the Court makes the following findings of fact and conclusions of law[1] in support of judgment in favor of Defendant CIBC.

---

[1] The Court describes facts, discusses evidence, and uses various forms of the word "find" to indicate a finding of fact, and sets forth legal principles and uses forms of the words "hold" and "conclude" to indicate a conclusion of law. To the extent a finding of fact is more properly a conclusion of law, and to the extent a conclusion of law is more properly a finding of fact, it should be so construed.

## I.   <u>BACKGROUND FINDINGS OF FACT</u>

Plaintiff Seven Seas was an oil exploration and development company.  By 1997, its principal asset was its 57.7% working interest in the exploration and development of the Guaduas Fields in Colombia, South America.  The Guaduas Fields included shallow oil reserves ("Shallow Fields") that were developed and producing, and prospects for deep reserves ("Deep Well").  Seven Seas was the operator in charge of the exploration and development of the Guaduas Fields.

From 1998 through 2002, Robert Hefner was the Chairman of Seven Seas' Board of Directors ("Board"), its largest shareholder, and its Chief Executive Officer. During that same time frame, Larry Ray was Seven Seas' President and Chief Operating Officer, and a member of the Board.  The other Directors in 2001 were James Schlesinger, Randolph Devening, Brian Egolf, Gary Fuller, and Robert Panero. Each of the Directors had substantial business and/or oil and gas experience.

By 1998, Seven Seas had announced publicly that it planned to develop the Guaduas "Shallow Fields" and to explore the Guaduas prospects for a "Deep Well." It had always been Hefner's plan to drill the Deep Well, and all members of the Board favored drilling the Deep Well.[2]  Seven Seas management believed that the possibility

---

[2]     Indeed, Director Gary Fuller testified that Director Brian Egolf wanted to devote all funds from the Secured Financing exclusively to the Deep Well and forego the pipeline and developing the Shallow Fields.

of developing the deep reserves was slight, but that the benefit to the Company would be enormous if the drilling was successful.  Todd Habliston, a geologist for Seven Seas, believed that the chance of a successful Deep Well was 1 in 50, but his opinion was inconsistent with the slightly more favorable opinion held by Roberto Aguilera and Jay Namson, experts hired by Seven Seas to evaluate the Deep Well potential.  It was reasonable for Hefner and the Seven Seas Directors and Officers to accept the experts' opinions rather than Habliston's.

Plaintiff maintains that its claims do not "turn on whether drilling the deep well was a reasonable business strategy."  *See* Plaintiff's Supplemental Proposed Findings and Conclusions [Doc. # 267], ¶ 2.  To the extent, as a practical matter, this strategy is an issue, the Court finds that drilling the Deep Well was not an unreasonable business decision.  Seven Seas was a company formed largely for the purpose of engaging in the highly speculative industry of oil and gas exploration in which investors were willing to take huge risks in the hope of great profit.[3]  It is undisputed that Hefner believed strongly and communicated repeatedly that the Deep Well would prove successful, and would generate significant revenue for Seven Seas.[4]

---

[3]     Seven Seas' case is based primarily on 20/20 hindsight without consideration of the essence of the Company and its stated purpose.

[4]     The Court notes that Ben Floyd, Seven Seas Bankruptcy Trustee, conducted his own analysis and explored further drilling of the Deep Well.  Specifically, Floyd met with
(continued...)

By 1998, Seven Seas had announced also that it intended to build a pipeline to connect the Guaduas Fields in remote Colombia to an existing pipeline. The pipeline was necessary to transport the oil and gas from the Guaduas Fields, a very dangerous area. Ron LeFaive, Seven Seas' former Chief Financial Officer, testified that there was a "cottage industry" in this area of Colombia that involved kidnappings for ransom, stealing the trucks transporting oil, and other guerilla activities. At the time, exploration in the Shallow Fields was successful. The Court finds that the decision to build the pipeline was quite reasonable.

In May 1998, Seven Seas raised $110,000,000.00 through unsecured notes, or "Bonds," to drill additional wells, build the pipeline, and drill a deep exploratory well. Under the terms of the indenture governing the unsecured notes, Seven Seas was required to make semi-annual interest payments of $6.9 million on May 15 and November 15 of each year until May 2005 when the notes matured. In connection with the 1998 Bonds offering, Seven Seas hired Donaldson Lufkin & Jenrette as the lead underwriter, with CIBC and three other investment companies serving as junior underwriters.

---

[4]     (...continued)
representatives of Schlumberger and other companies that were enthusiastic about the Deep Well's potential.

From 1998 through 1999, Seven Seas had nearly $100 million in operating losses. The Company's 10-K filing for the year ending 1999 stated that Seven Seas had substantial indebtedness and did not have adequate revenue to pay its debt.

At the July 2000 meeting of the Seven Seas Board, the Directors discussed options available for further developing the Guaduas Fields, including the prospect of a Deep Well. The Board authorized Seven Seas management to explore means of raising $25 million in secured, convertible debt, plus $10 million for the pipeline. The Board considered an offer by CIBC to act as Seven Seas' strategic financial advisor for any sale of the Company or its assets or for any debt restructuring. CIBC had not performed work for Seven Seas since the Bond offering in 1998. Notably, in 2000, the Board was not willing to consider a restructuring or sale of Company assets. As a result, the Board rejected CIBC's offer and, instead, authorized Larry Ray to negotiate an agreement to engage CIBC as Seven Seas' strategic advisor to raise $25 million. *See* Minutes of Board Meeting on July 27, 2000, CIBC's Exh. 1. CIBC and Seven Seas did not reach such an agreement, and the $25 million financing was not consummated.

In 2001, Seven Seas was insolvent and facing possible bankruptcy. In an attempt to raise funds, Seven Seas considered hiring CIBC, Jefferies, or another investment banking firm, to serve as Seven Seas' exclusive financial advisor, to assist

in raising additional funds, and to render a fairness opinion in connection with any potential funding transaction.[5]  In February 2001, Seven Seas selected CIBC.  Unlike the Bond offering in 1998, Seven Seas hired only CIBC to work on the funding in 2001.  The Court finds that, as of February 2001, CIBC was Seven Seas "exclusive" financial advisor for this transaction, but not for all financial matters.  Larry Ray testified that he would not characterize CIBC as Seven Seas' "exclusive financial advisor."

CIBC and Seven Seas signed a second engagement agreement in March 2001. This agreement was necessary because Seven Seas had reached an agreement to obtain $45 million in secured financing (the "Secured Financing").  Chesapeake Energy Corporation ("Chesapeake") agreed to provide $22.5 million, and another $22.5 million was to come from other sources.[6]  The second $22.5 million eventually was provided by a group of Seven Seas' "insiders," including Hefner and, ultimately, three other members of the Company's seven-member Board and a small number of Seven

---

[5]     Bryan Sanchez, Hefner's Personal Assistant, testified that, in addition to CIBC and Jefferies, there were four or five investment banking firms contacting Seven Seas about performing work for the Company.

[6]     Chesapeake, providing half the funding, insisted that Hefner participate, *i.e.*, "have skin in the game," in the second half of the funding.

Seas shareholders.[7]  Bryan Sanchez, Hefner's Personal Assistant, testified that the Seven Seas Board told CIBC it was only to work on the Fairness Opinion.  The Court credits this testimony.  As of March 2001, CIBC's role was to provide a fairness opinion for the Secured Financing, stating whether or not the transaction was fair to Seven Seas from a financial point of view.  CIBC's role was to provide a fairness opinion if warranted.  At this time, CIBC had a circumscribed role and did not serve as Seven Seas' exclusive financial advisor for all matters.

Seven Seas asked Chesapeake to wait for the Company to obtain shareholder approval for the transaction.  Director Fuller testified that Seven Seas asked Chesapeake to "stand by" and wait for the Company to obtain shareholder approval, but Chesapeake was not willing to do so.  The Court credits this testimony. Chesapeake, although apparently interested in delaying or staggering the funding of its part of the Secured Financing, was not willing to "stand by" and wait for Seven Seas to conduct a shareholder vote.[8]  Jason Thomas Meek, the CIBC employee working on the Secured Financing, testified that Seven Seas wanted to avoid the need

---

[7]     The opportunity to participate in the Secured Financing on the same terms as other insiders was offered to most Seven Seas shareholders in the United States.  Only a small number of shareholders elected to participate.

[8]     Chesapeake was not willing to "stand by," meaning it was not willing to commit to the financing transaction, yet wait for a binding commitment from Seven Seas that the Company would enter into the financing arrangement with Chesapeake.

for a shareholder vote because of the delay involved, and the Company did not believe

Chesapeake would wait.  Bryan Sanchez testified similarly that there was concern that

waiting for shareholder approval would jeopardize Chesapeake's willingness to

participate in the Secured Financing.  Larry Ray testified that timing was of the

essence, and that the Company did not request an exception from the American Stock

Exchange ("AMEX") because it believed the shareholders would not approve the

Secured Financing proposal.[9]  LeFaive testified that Seven Seas wanted to avoid the

shareholder vote because of the delays inherent in obtaining such a vote.  He testified

that there would have been no reason not to have a shareholder vote if Chesapeake had

been willing to "stand by" and wait for that vote.  The Court credits these witnesses'

testimony.  The Court finds that because Chesapeake was not willing to "stand by"

and wait for Seven Seas to obtain shareholder approval, Seven Seas requested an

AMEX exception to the shareholder vote requirement.[10]

---

[9]     The AMEX requires a shareholder vote before a company issues shares to insiders
that would dilute other shareholders' holdings.  *See* AMEX Rule 713.  A company
may seek an exception to this rule if a delay would seriously jeopardize the financial
viability of the company.  Seven Seas requested this AMEX exception.

Additionally, the Indenture underlying the unsecured notes issued in May 1998
provided that any affiliate transactions involving more than $5 million required an
opinion from an investment bank that the transaction was fair to Seven Seas from a
financial point of view.

[10]    There were various estimates at the time regarding how long it would take to obtain
a shareholder vote.  Director Fuller testified that it actually took until December the
(continued...)

In mid-April 2001, Seven Seas asked for CIBC's comments on a draft letter to the AMEX requesting the exception.  The letter was submitted to the AMEX in final form on April 23, 2001 by Seven Seas' lawyers, McAfee & Taft.  The letter advised the AMEX that Chesapeake had made it clear that time was of the essence, and that waiting for shareholder approval might preclude its participation.  The letter also included statements that CIBC believed that the loss of Chesapeake as an investor "would seriously jeopardize the financial viability of Seven Seas," that "neither the company nor CIBC has identified an alternative lead investor," that CIBC "does not know if an alternative lead investor could be identified, the terms that might be available or the time required to find such a party," and that "CIBC believes that the probabilities are low that an alternative lead investor could be found that would provide better terms."  *See* April 23, 2001 Letter, CIBC's Exh. 29.  The Court finds that Seven Seas has failed to prove that the statements attributed to CIBC in the April 23, 2001 Letter were false or intentionally misleading.[11]

CIBC and Seven Seas genuinely believed that the loss of Chesapeake as an investor would seriously jeopardize the Company's financial viability, and that belief

---

[10]    (...continued)
following year (2002) to "get to a shareholders meeting" in connection with the Secured Financing.  *See* Fuller Depo., p. 228.

[11]    The Court finds that the editorial changes made by CIBC to satisfy the AMEX are not probative of an intention by CIBC to mislead.

was well-founded.  Neither CIBC nor Seven Seas had identified an acceptable alternative lead investor.  There had been a prior proposal by the Wedge Group in mid-2000, but Wedge's mild interest was viewed as a "courtesy" and was short-lived. A proposal by Sipetrol and Cimarrona, working interest partners in the Shallow Fields, was unacceptable because it was fundamentally a take-over of Seven Seas' interest after which Seven Seas would no longer serve as operator.  Operatorship of an oil and gas field has monetary value because it allows control over decision regarding where, when, and even whether to drill.  There is no evidence that these or any other offers were consistent with the Board's strategic business decision to develop the Shallow Fields and drill the Deep Well.  The Court finds that CIBC, given the existing time constraints, conducted a reasonable investigation into the availability of potential alternative investors by discussing with its in-house experts market conditions and the likelihood of finding someone who might be interested in a financing arrangement with Seven Seas.  Seven Seas had spent approximately two years seeking favorable financing, and the loan from Chesapeake appeared to be the Company's best, if not its only, option given the Company's and its Board's priority of drilling the Deep Well.

The April 23, 2001 Letter stated also that Seven Seas projected a cash deficiency *as early as* July 2001, and referred to an attached schedule that projected

a negative cash position by September 2001.  Seven Seas' auditor, Arthur Andersen, had issued a "going concern" opinion, indicating a concern that Seven Seas was likely to have trouble meeting its financial commitments through December 2001. Plaintiff's expert, Dean Graves, acknowledged that Seven Seas would have a cash deficiency by November 2001 absent additional financing.   These financial projections, while varied, establish that Seven Seas would likely experience a cash deficiency as early as July 2001 and as late as December 2001.  The timing was uncertain because it depended on various factors.  There is no credible evidence that any of these projections was fraudulently prepared.  Bryan Sanchez testified that the Company was constantly producing projections based on differing scenarios and assumptions.  Indeed, the Court finds that it was a common and acceptable business practice to perform different projections based on varied possible scenarios.  LeFaive testified that there was never any attempt to mislead the AMEX about the Company's financial condition.  Sanchez testified that the data provided to the AMEX was not manipulated or false.   The Court credits LeFaive's and Sanchez's testimony. Significantly, there is no evidence that CIBC participated in the creation of any financial projections or in the selection of the financial projections sent to the AMEX.

The Company's April 23, 2001 Letter further advised the AMEX that Chesapeake had "made it clear that timing is of the essence, and that waiting for

shareholder approval may preclude its participation."  *See* April 23, 2001 Letter,

CIBC's Exh. 29.  As discussed above, Chesapeake expressed some willingness to

delay its funding of the loan, but that company was unwilling to delay finalizing its

role as lead investor in the Secured Financing.  As a result, this statement in the letter

to the AMEX was true.

CIBC issued its preliminary fairness opinion in May 2001.  William Clifford

Atherton, CIBC's expert witness, testified that a fairness opinion has a limited scope,

examining a specific transaction and advising the client whether it is fair to the client

from a financial point of view.[12]  Atherton testified that "fair from a financial point of

view" is a term of art in the investment banking industry, meaning that the client is

giving and receiving consideration that is roughly equivalent.

Under the terms of the Secured Financing in this case, Chesapeake would fund

$22.5 million, and the remaining $22.5 million would be provided by a group of

investors, some of whom were related to Seven Seas.  Chesapeake required Hefner to

contribute at least $15 million of the $22.5 million that Chesapeake did not provide.

The Secured Financing notes had a coupon rate of 12% and were secured by Seven

---

[12]   Atherton has a Ph.D. in Finance from the University of Texas, and is certified as a
Chartered Financial Analyst.  He has significant experience preparing fairness
opinions, and has taught investment banking classes on fairness opinions.  He has
taught at Rice University, the University of Houston, and the University of Texas.
The Court finds Atherton to be very capable and knowledgeable.  In making its
findings of fact, the Court accepts Atherton's testimony as both credible and helpful.

Seas' assets.  In addition to the notes, Chesapeake received warrants to purchase Seven Seas shares at a strike price of $1.78, a price less than the shares were trading as of May 11, 2001.  The warrants could not be exercised until after April 30, 2002.

Hefner and the other interested Directors who agreed to participate in the Secured Financing did not receive the warrants initially.  Instead, they received short-term notes pending the outcome of a rights offering pursuant to which most Seven Seas shareholders in the United States were offered the opportunity to purchase notes with warrants on the same terms as the Directors who were participating in the Secured Financing.  Only if and to the extent the shareholders declined to purchase notes with warrants did the Directors become entitled to exchange their short-term notes for notes with warrants.  Hefner and the other participating Directors subsequently received warrants which, like Chesapeake's warrants, could not be exercised until after April 30, 2002.

In return for the notes and warrants, Seven Seas received $45 million in working capital and was thereby enabled to continue as an operating business.  Seven Seas used the funding to pay off the remaining balance of a $10 million line of credit from Stillwater Bank, to continue to pursue its business plan of developing the Shallow Fields, and to make the November 2001 interest payment on the Bonds. Without the Secured Financing, Seven Seas would have lost its ownership of the

Guaduas Field and the opportunity to explore the Deep Well.  Indeed, the Court finds that without the Secured Financing, Seven Seas would soon have ceased to exist as a company.

Seven Seas scheduled a Board meeting for May 17, 2001, to consider and vote on the Secured Financing.  CIBC attended the meeting to deliver its preliminary fairness opinion, which was that the transaction was fair to the Company from a financial point of view.  CIBC agreed to provide a draft written fairness opinion for the Board's review.

During the Board meeting on May 17, 2001, CIBC presented a detailed financial report referred to as the "Sniper Report," which consisted of historical analysis and models based on different operating assumptions, including a "football field" diagram.  *See* Sniper Report, Seven Seas' Exh. 216.  CIBC projected that if the equity per share amount was likely to be less than the exercise price for the warrants, then the warrants would not be exercised and, therefore, would have no value.  CIBC projected different scenarios as to whether the warrants were likely to have value.  The Court finds that it is not unusual for companies to run multiple financial projections to account for different possible future developments.  CIBC's scenarios were based on Ryder Scott's oil reserve projections and assumptions of future oil production from the Shallow Fields and, if the Deep Well were drilled, whether it generated either zero

production, 25% of the production projected by DeGolyer & MacNaughton, or 50% of the DeGolyer & MacNaughton-projected production. Under the scenario where the Deep Well was not a success, the most likely scenario, the warrants would probably expire without being exercised. The Court finds that CIBC reasonably relied on the projections of Ryder Scott, a world-renowned expert in the field of reservoir engineering, and of DeGolyer & MacNaughton, regarding the available oil reserves in the Shallow Fields and in the Deep Well.[13]

CIBC prepared its "Sniper Report" projection using its own internal experts' price deck to forecast oil prices. Plaintiff's expert Dean Graves testified that CIBC's price decks were reasonable and that it was not objectionable for CIBC to use its own price decks. The Court finds that it was reasonable for CIBC to rely on its own price decks to forecast oil prices.

The coupon rate of the Secured Financing was 12%. Ian Ratner, an expert called by CIBC to testify at trial, calculated the effective interest rate between 15.19%

---

[13]     Seven Seas's expert Douglas Brickley criticized CIBC's Sniper Report because it failed to discount Ryder Scott's estimates of the proved undeveloped ("PUD") reserves. CIBC's employee, Jason Thomas Meek, testified that in connection with his work at CIBC and at Jefferies, he used undiscounted PUDs many times and considered it standard procedure for modeling. Ian Ratner, CIBC's expert, testified that it is appropriate not to discount PUD reserves when performing best case scenario modeling. The Court credits the testimony of Meek and Ratner, and finds that the failure to discount the Ryder Scott estimates of the PUDs was not impermissible. The Court finds that the failure to discount the PUDs did not render the Sniper Report false, fraudulent, or produced in a grossly negligent manner.

and 15.36%.  Ratner testified that this rate of interest for the $45 million Secured Financing was fair.  Atherton calculated an effective interest rate of 16% and testified that the interest rate was fair to Seven Seas.  The Court credits Ratner's and Atherton's analysis and calculations.  Seven Seas presented no evidence that it could have obtained the needed financing at an equal or lower effective interest rate.  Additionally, the Court finds Seven Seas' evidence on the fairness of the 12% interest rate to be unpersuasive.  Douglas Brickley, an expert called by Seven Seas to testify at trial, identified certain oil and gas transactions involving companies' bonds rated B to BBB and found an average effective rate for those transactions of 9.6%.  Although the Court believes that Brickley's testimony is accurate, the Court finds it unpersuasive because the companies he included in his review were not comparable to Seven Seas.  The bonds in Brickley's list of transactions were higher rated than Seven Seas' were likely to be, and were trading at a much higher percentage of par value than the existing $110 million unsecured notes issued by Seven Seas.  Having carefully considered and evaluated the testimony presented at trial, the Court finds that Seven Seas has failed to prove that the interest rate in the Secured Financing was unfair.[14]

---

[14]    A factor negatively affecting the Court's view of Brickley's testimony is his reliance on Loretta Cross's report.  The Court finds Loretta Cross's report and testimony unpersuasive and declines to adopt her conclusions.

After CIBC presented its preliminary fairness opinion (the "Sniper Report") at the May 17, 2001 Board meeting, CIBC's representatives were excused from the meeting. After CIBC's representatives left the meeting, Seven Seas' lawyers from McAfee & Taft discussed fiduciary duty issues with the Board members. The Directors present at the meeting, including all the Directors who were not participating in the offering, voted to proceed with the Secured Financing.[15] No member of the Board testified that he relied on the CIBC preliminary fairness opinion when deciding to vote to approve the Secured Financing.

CIBC issued its formal written Fairness Opinion on July 23, 2001. CIBC stated that, based on a comparison of the consideration Seven Seas was paying with the consideration Seven Seas was obtaining in the Secured Financing, the transaction was fair to Seven Seas from a financial point of view.[16] *See* Fairness Opinion, Seven Seas' Exh. 246. Atherton testified that he independently reached the same view. CIBC did not opine regarding whether the Secured Financing was fair to minority shareholders, creditors, or any person or entity other than the Company.

---

[15] Director Devening was not present at the May 17, 2001 meeting.

[16] The Court notes that Cary Ferchill, Plaintiff's expert in the lawsuit against the Directors, did not disagree with CIBC's opinion, stating "I don't have any problem with the opinion."

CIBC was not retained to, and did not, advise Seven Seas on its business decisions. Similarly, CIBC was not retained to, and did not, attempt to structure a different financing arrangement for Seven Seas, or to consider the relative merits of the Secured Financing as compared to other available business strategies that might exist but were strategically unacceptable to the Company. The Court finds that CIBC's only assignment as of March 2001 was to provide a fairness opinion regarding whether the consideration exchanged in the Secured Financing was fair to Seven Seas from a financial point of view.

In the Fairness Opinion, CIBC disclosed that it "relied upon and assumed, without independent verification or investigation, the accuracy and completeness of all of the financial and other information provided . . . by the Company and its employees, representatives, and affiliates"[17] *See* Fairness Opinion, CIBC's Exh. 9. CIBC stated unequivocally that it was "not expressing any opinion as to the underlying valuation, future performance or long term viability of the Company." *See id.* Importantly, CIBC stated that it had "not been asked to consider, and our opinion does not address, the relative merits of the transaction as compared to any alternative business strategies that might exist for the Company . . .." *See id.* CIBC was not retained to provide, and did not provide, any opinion regarding Seven Seas'

---

[17]     Atherton testified that it is standard procedure when preparing a fairness opinion to assume the accuracy of the company's information.

operational or business decisions, including the Company's decision to build the pipeline and drill the Deep Well.

CIBC was paid $720,500.00 for its work on the Fairness Opinion.  Hefner, Ronald Ormand, Managing Director for CIBC during the relevant time frame, and Director Fuller all testified that CIBC would be entitled to payment whether or not CIBC's opinion was that the Secured Financing was fair to Seven Seas from a financial point of view.[18]  Although CIBC's work on the "Sniper Report" and the written Fairness Opinion may have had certain weaknesses, Seven Seas has failed to prove that the statements in the preliminary or final Fairness Opinions were false or misleading.

The Secured Financing closed in July 2001.  The members of the Board and the management team at Seven Seas believed that the transaction was not only in the Company's best interest, but was vital to its continued existence.  LeFaive testified that he had performed his own due diligence and thereafter decided to join the Company, effectively betting his career on the Deep Well's success.  LeFaive testified that, "to this day," he had not seen anything nefarious in the Secured Financing.  As is discussed more fully below, Seven Seas has failed to prove that CIBC engaged in a conspiracy with the Board or any of its members to breach any fiduciary duty.

---

[18]     Ormand testified further that it was unlikely that Seven Seas would have CIBC issue a written opinion if it concluded that the transaction was not fair.

Although a fairness opinion from some source was needed to complete the Secured Financing, it was not necessary that the fairness opinion be provided by CIBC.  Indeed, had CIBC declined to issue a fairness opinion to Seven Seas, it is more likely than not that Jefferies or one of the other interested investment companies would have provided the opinion.  LeFaive and Atherton both testified specifically that they believed another investment bank could and would have given the same fairness opinion, and Seven Seas presented no evidence to the contrary.

On December 3, 2001, the Board confirmed its decision to drill the Deep Well.  On December 6, 2001, drilling began.  Also in 2001, Seven Seas and its partners were developing the Shallow Fields.

In August 2002, because of unexpectedly weak performance of successful wells, Ryder Scott issued a new reserve report that reflected a 66% decrease in its estimate of the reserves in the Shallow Fields.  LeFaive testified that the inaccuracy of Ryder Scott's original estimate of the Shallow Fields and the subsequent decrease in the reserves estimate is what "killed" the Company.

During early 2002, Seven Seas continued its exploration drilling of the Deep Well.  Ultimately, the drilling operations funded by the Secured Financing were unsuccessful.

On December 20, 2002, certain unsecured creditors filed an involuntary Chapter 7 bankruptcy petition as to Seven Seas. Seven Seas converted the bankruptcy to Chapter 11 on January 13, 2003. The following day, Ben Floyd was appointed as Trustee. On August 4, 2003, the bankruptcy court confirmed the Chapter 11 Trustee's Second Amended Plan of Reorganization.

On October 14, 2008, Seven Seas filed this lawsuit against CIBC. In its Complaint, Plaintiff Seven Seas brings claims against CIBC for aiding and abetting the Directors' breach of fiduciary duty and conspiracy (Count 1); breach of fiduciary duty (Counts 2 and 3); gross negligence (Count 4); and fraud (Count 5). The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) and § 1334(a). Venue in this district is proper pursuant to 28 U.S.C. § 1391(b)(2) and § 1409(a).

## II.  AFFIRMATIVE DEFENSES

CIBC argues that Seven Seas' conspiracy and gross negligence claims are barred by the applicable statute of limitations, and that various claims are barred by the doctrine of *in pari delicto*. CIBC bears the burden of proof on its affirmative defenses. *See, e.g., Garner v. Fid. Bank, N.A.*, 244 S.W.3d 855, 861 (Tex. App. – Dallas 2008, no pet.); *see also West v. Proctor*, 353 S.W.3d 558, 568 (Tex. App. – Amarillo 2011, review denied) (statute of limitations); *Reneker v. Offill*, 2012 WL 2158733, *4 (N.D. Tex. June 14, 2012) (*in pari delicto*). Plaintiff has the burden of

proof on its arguments to avoid the statute of limitations defense, such as the discovery rule and tolling.  *See Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 518 (Tex. 1988); *West*, 353 S.W.3d at 568.

### A.    <u>Statute of Limitations</u>

CIBC argues that Seven Seas' claims for conspiracy and gross negligence are time-barred.  Under Texas law, both claims have a two-year limitations period.  *See* TEX. CIV. PRAC. & REM. CODE § 16.003.  This lawsuit was filed on October 14, 2008.  Unless some basis existed for extending the limitations period to that date, the conspiracy and gross negligence claims would be time-barred because it is undisputed that these claims accrued well prior to October 2006.

Seven Seas filed its Chapter 11 bankruptcy petition on January 13, 2003.  The Bankruptcy Code provides a limitations period for actions brought by the Bankruptcy Trustee.  Section 108(a) of Title 11 of the United States Code provides specifically:

> If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of--
>
> > (1)    the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
> >
> > (2)    two years after the order for relief.

11 U.S.C. § 108(a).  The statute's plain language thus provides that, for claims that had not expired when Seven Seas' bankruptcy petition was filed on January 13, 2003, the limitations period expired on the later of (1) the date Texas's statute of limitations expired, including any suspension of the period, or (2) two years after the bankruptcy filing, *i.e.*, January 13, 2005.  It is undisputed that the lawsuit was not filed until October 14, 2008.

### a.   Section 108(a)(1)

Seven Seas argues that various doctrines suspended or otherwise extended the limitations period under Texas law.  Specifically, Seven Seas argues that its gross negligence and conspiracy claims are timely under § 108(a)(1) based on adverse domination, the discovery rule, and equitable estoppel.

### 1.   Adverse Domination

Seven Seas argues that, until the appointment of the bankruptcy Trustee on January 14, 2003, the Company was controlled by a group of officers and directors who were engaged in intentional wrongful conduct and therefore, under the adverse domination doctrine, the statute of limitations for gross negligence and conspiracy did not start to run until that date.  If Seven Seas could prove adverse domination, the two-year limitations period would not begin to run until January 14, 2003, and the limitations period would have expired, absent suspension, on January 14, 2005.

On September 17, 2003, the parties signed a tolling agreement ("Original Tolling Agreement" or "OTA").  In the OTA, in consideration for the Trustee's agreement to dismiss CIBC without prejudice from the Directors Litigation,[19] CIBC agreed to "toll the applicable statute of limitations for one year from the date of this letter . . .."  The OTA tolled the limitation period "for one year," thus extending the filing deadline until January 14, 2006.[20]

On January 6, 2006, the parties executed the first of a series of other tolling agreements, which extended the limitations period without interruption through October 15, 2008.  This lawsuit was filed on October 14, 2008.  Therefore, Seven Seas argues that the adverse domination doctrine saves its claims for conspiracy and gross negligence.

The adverse domination exception tolls a limitations period when (1) the wrongdoer directors constitute a majority of the company's board of directors and (2) the majority's wrongdoing was intentional.  *See Askanase v. Fatjo*, 130 F.3d 657, 666 (5th Cir. 1997); *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns.*, 2012 WL 3100778, *15 (N.D. Tex. July 31, 2012) (Fish, J.).  The doctrine is used "to toll limitations on a

---

[19]     Civil Action No. 4:03-5693 (S.D. Texas, Houston Division).

[20]     The parties have not addressed whether the "suspension" of the limitations period in § 108(a)(1) may be accomplished through the parties' agreement or whether, instead, the suspension requires adoption of the agreement in a court order.  Consequently, the Court does not reach this issue.

corporate action while the corporation is controlled by those culpably involved in the wrongful conduct on which the action is based," because a wrongdoing corporate director will seek to hide his wrongful conduct from the corporation. *See FDIC v. Henderson*, 61 F.3d 421, 425-26 (5th Cir. 1995).   Proof of such wrongdoing will reverse the presumption under Texas law that informed directors would exercise good business judgment in management of the corporation and would induce the corporation to sue culpable directors. *See id.* at 426-27.  The limitations period is tolled "until a majority of the directors is disinterested and informed of the wrongdoing." *Id.* at 426.

Tolling based on adverse domination is generally not applicable to a gross negligence claim because there "must be active participation in wrongdoing or fraud." *See Askanase*, 130 F.3d at 667 (citing *RTC v. Acton*, 49 F.3d 1086, 1091 (5th Cir. 1995)).  As is discussed herein, Seven Seas failed to prove that the interested members of the Board engaged in intentional misconduct.  Consequently, adverse domination does not save the gross negligence claim.

Regarding the conspiracy claim, Seven Seas argues that all it "must prove to assert the doctrine [of adverse domination] is that a majority of the board was engaged in intentional wrongdoing." *See* Seven Seas' Response to CIBC's Proposed Findings and Conclusions [Doc. # 274], p. 69.  The Court finds that Seven Seas has failed to

satisfy its burden, even the limited burden argued by Plaintiff.  As discussed above, Seven Seas has failed to prove that the interested Directors actively participated in intentional wrongdoing or fraud.  The Court finds specifically that the Directors, including the interested Directors, were acting in what they reasonably believed was the best interest of the Company.  The Directors were successful businessmen, many with extensive experience in the oil and gas industry.  Therefore, the Court concludes that the adverse domination doctrine does not extend the statute of limitations on the conspiracy claim.

### 2. Discovery Rule

Seven Seas argues alternatively that the two-year limitations period on its conspiracy and gross negligence claims was tolled by application of the discovery rule, which requires a showing that (1) the nature of Seven Seas' injury was inherently undiscoverable, and (2) the evidence of the injury is objectively verifiable.  *See Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009) (citing Texas law).  Seven Seas failed to prove that its alleged injury was inherently undiscoverable.  The Fairness Opinion was publicly disclosed, along with the details of the Secured Financing, by July 2001.  The use of those funds to drill the Deep Well, which began in December 2001, was not hidden from anyone.  Moreover, Seven Seas' argument that the alleged injury was inherently undiscoverable is refuted by the Trustee's filing

suit in the Directors Litigation in March 2003, well within the § 108(a) two year limitations period.  The Court concludes that Seven Seas has failed to prove that the discovery rule applies to render the conspiracy and gross negligence claims timely.

### 3.     Equitable Estoppel

Seven Seas argues that CIBC is equitably estopped from arguing that Seven Seas' conspiracy and gross negligence claims are time-barred because (1) by agreeing to extensions of the OTA, CIBC led Seven Seas to believe that its claims were preserved, and (2) by failing to produce responsive documents regarding the Secured Financing as required by the OTA, CIBC proceeded under the OTA in bad faith.  To prevail on an equitable estoppel argument, Seven Seas must prove "(1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations." *Doe v. Roman Catholic Archdiocese*, 362 S.W.3d 803, 810 (Tex. App. – Houston [14th Dist.] 2012, no. pet.) (citing *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515–16 (Tex. 1998)).

Seven Seas has failed to establish equitable tolling based on CIBC's agreement to extensions of the OTA.  Seven Seas had full knowledge of the contents of the OTA

and the extension agreements.  Seven Seas was represented by counsel[21] and could determine to what extent the tolling agreements preserved conspiracy and gross negligence claims against CIBC.  Because Seven Seas has failed to prove that it was without knowledge or means of obtaining knowledge of the OTA, the later extension agreements, and their effect on the applicable statutes of limitations, equitable estoppel on this basis does not apply.

Seven Seas argues also that CIBC is equitably estopped to assert the statute of limitations because it failed to produce documents.  The Court finds that Seven Seas has failed to prove that CIBC's representation in June 2004 that it had produced all responsive documents was incorrect.  Even if it did miss certain documents, there is no evidence the omissions were with knowledge that it had not, in fact, produced all documents actually requested during the tolling period.  CIBC is not equitably estopped to assert the statute of limitations as to the gross negligence and conspiracy claims, which remain time-barred.

### b.    Section 108(a)(2)

Seven Seas argues that the two-year extension of the limitations period pursuant to § 108(a)(2) was extended by the OTA and subsequent tolling agreements.  CIBC

---

[21]    McAfee and Taft, named as a defendant in the Directors Litigation, was no longer counsel for Seven Seas.

argues that § 108(a)(2) cannot be extended by agreement of the parties.  The Court agrees that the two-year limitations period in § 108(a)(2) cannot be suspended.

The Court, when analyzing statutory language, assumes that "the ordinary meaning of that language accurately expresses the legislative purpose."  *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, ___, 130 S. Ct. 2149, 2156 (2010) (citing *Gross v. FBL Fin. Servs., Inc*., 557 U.S. 167, 175 (2009)).  Additionally, "when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."  *Sosa v. Alvarez–Machain*, 542 U.S. 692, 712 n.9 (2004); *Russello v. United States*, 464 U.S. 16, 23 (1983) (when Congress includes particular language in one section of a statute but omits it from another section of the same statute, "it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion").

In § 108(a), Congress specifically provided for "suspension" of the limitations period in subparagraph (1) but did not similarly provide for "suspension" of the two-year provision in subparagraph (2).[22]  Applying the rules of statutory construction discussed above, the Court concludes that Congress did not provide for the suspension, by agreement or otherwise, of the two-year period in § 108(a)(2) for

---

[22]    As mentioned above, the parties do not argue and thus the Court does not address whether the "suspension" in § 108(a)(1) may be accomplished by agreement of the parties with or without court approval.

claims for which the period during which the debtor may commence an action has not expired.[23]  As a result, the gross negligence and conspiracy claims were not brought timely under § 108(a)(2).

## B.  *In Pari Delicto* Doctrine

CIBC has invoked the *in pari delicto* doctrine as a defense to certain Seven Seas' claims.  *In pari delicto* is an affirmative, equitable defense providing that "wrongdoers ought to bear the consequences of their wrongdoing without legal recourse against each other."  *Jones v. Wells Fargo Bank*, 666 F.3d 955, 965 (5th Cir. 2012).  "The doctrine embodies 'the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct, and is undergirded by the concerns, first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality.'"  *Id.* (quoting *Rogers v. McDorman*, 521 F.3d 381, 385 (5th Cir. 2008)).  As this Court held previously, the defense may be asserted against a bankruptcy trustee.  *See* Memorandum and Order [Doc. # 190], pp. 24-27 (citing, *e.g.*, *Jones*, 666 F.3d at 967-68).

---

[23]    The Court is unpersuaded by Seven Seas' argument that a ruling that § 108(a)(2) cannot be suspended by agreement would have serious public policy ramifications. A bankruptcy trustee can seek a suspension of the statute of limitations from a court under § 108(a)(1), or can commence a lawsuit within two years after the order for relief under § 108(a)(2).

The Court finds that Seven Seas, independent of CIBC, took actions in 2001 concerning the Secured Financing and engaged in other company operations that, while reasonable under the circumstances, caused the damages Seven Seas now seeks to recover from CIBC.  The Company's decision to engage in the Secured Financing was in furtherance of the Board's unanimous decision in July 2000 to pursue financing to continue development of the Shallow Fields and to drill the Deep Well. The decision to develop the Shallow Fields and drill the Deep Well was perceived by the Board at the time to be in the Company's best interest.  The Court finds no general equitable or public policy reason not to apply the *in pari delicto* defense in this case to bar Seven Seas' claims that CIBC conspired and aided and abetted the Directors' alleged breaches of fiduciary duty.

*Adverse Interest Exception*.– Seven Seas argues that the *in pari delicto* doctrine does not apply in this case because the adverse interest exception protects corporations from imputation of an agent's conduct where the agent acted "entirely for his own or another's purpose."  *FDIC v. Shrader & York*, 991 F.2d 216, 213 (5th Cir. 1993). "The adverse interest exception is a narrow one; for it to apply, the agent must have totally abandoned his principal's interests and be acting entirely for his own or another's purposes."  *In re Sunpoint Secs., Inc.*, 377 B.R. 513, 564 (Bankr. E.D. Tex.

2007) (citing *Askanase v. Fatjo*, 130 F.3d 657, 666 (5th Cir. 1997)).  Plaintiff bears the burden of proof to establish that the exception applies.  *See id.*

Plaintiff has failed to satisfy its burden of proof.  The Court finds that the decision to engage in the Secured Financing was made by the entire Board, including non-interested Directors.  Seven Seas has failed to prove that the interested Directors were acting entirely for their own purpose.[24]  Indeed, the Court finds that the entire Board believed that the Secured Financing, needed to develop the Shallow Fields (including building the pipeline) and to drill the Deep Well, was in the Company's best interest.  Successful exploration of the Deep Well would, without question, have benefitted Seven Seas enormously.  The Secured Financing benefitted the Company by allowing it to make upcoming interest payments, to pay off debt, to eliminate Arthur Andersen's "going concern" qualification, to retain the operatorship of the entire Guaduas Field, and to continue in existence as an operating company.  The "adverse interest" exception does not apply in this case to preclude application of the *in pari delicto* defense.

---

[24]  Seven Seas focuses on the benefits Hefner received in the Secured Financing.  For purposes of an adverse interest exception to the application of the *in pari delicto* doctrine, however, the focus is on whether the interested party was acting *entirely* for his own purpose.  *See, e.g., Shrader & York,* 991 F.2d at 213; *In re Sunpoint*, 377 B.R. at 564.  In this case, the Company *and* Hefner *both* received a benefit from the Secured Financing.  As a result, Seven Seas has not proven that the adverse interest exception applies.

***Corporate Insider Exception***.– Seven Seas argues correctly that the *in pari delicto* defense does not apply to claims against a corporate insider. *See Floyd v. Hefner*, 556 F. Supp. 2d 617, 657 (S.D. Tex. 2008), and cases cited therein. CIBC is not, however, a corporate insider of Seven Seas. CIBC was not an officer, director, general partner, or other controlling entity of Seven Seas. Moreover, CIBC and Seven Seas did not have an extremely close and long-standing relationship such that CIBC would be considered a Seven Seas insider, and CIBC's dealings with Seven Seas were at arm's length. *See In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992). The Court rejects Seven Seas' argument that CIBC was an insider because it was the Company's exclusive financial advisor for all purposes because that assertion is unsupported by the evidence. Seven Seas has failed to prove that CIBC is not entitled to assert the *in pari delicto* defense because it was a corporate insider.

***Innocent Insider Exception***.– Seven Seas argues that "innocent decision-makers could have stopped the directors' wrongful conduct had they been fully informed." *See* Seven Seas Response to CIBC's Proposed Findings and Conclusions [Doc. # 274], p. 60. Texas law has not recognized an "innocent insider" exception to the *in pari delicto* defense.

Courts that potentially recognize the exception require proof that there was an innocent insider who "could and would have exercised actual corporate authority to

stop" the alleged wrongdoing.  *See, e.g., USACM Liquidating Trust v. Deloitte & Touche LLP*, 764 F. Supp. 2d 1210, 1221 (D. Nev. 2011).  In this case, Seven Seas has failed to identify an "innocent decision maker" who could and would have stopped the Secured Financing or the drilling of the Deep Well.  Indeed, the Court finds that there were no insiders who opposed the Secured Financing to enable drilling of the Deep Well.  The "innocent insider" exception, even if recognized in Texas, does not apply in this case to preclude CIBC's *in pari delicto* defense to the aiding and abetting, and conspiracy claims.

## III.   <u>AIDING AND ABETTING and CONSPIRACY CLAIMS</u>[25]

Seven Seas alleges that CIBC aided and abetted the Directors' breach of fiduciary duty, and conspired with the Directors to breach their fiduciary duty.[26]

---

[25]   Plaintiff's aiding and abetting and conspiracy claims are barred by the doctrine of *in pari delicto*, and the conspiracy claim is time-barred.  Nonetheless, for purposes of a complete record, the Court issues findings of fact and conclusions of law on the merits of these two claims.

[26]   In their Supplemental Proposed Findings and Conclusions [Doc. # 267], Seven Seas argues that CIBC aided and abetted outside counsel McAfee & Taft, and conspired with them, to breach counsel's fiduciary duty.  Seven Seas has never pled a conspiracy or aiding and abetting claim against CIBC in this lawsuit that involves McAfee & Taft's fiduciary duty to the Company.  As a result, this issue was not tried and is not part of this lawsuit.

### A.    Aiding and Abetting

To establish a claim of aiding and abetting a breach of fiduciary duty, Seven Seas must prove (1) the existence of a fiduciary duty, (2) CIBC's knowledge of the fiduciary duty; and (3) CIBC's knowledge that it was participating in the breach of that fiduciary duty.  *See Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007).  Knowledge, for purposes of an aiding and abetting claim, requires proof that CIBC had an "actual awareness, at the time of the conduct," that the Directors owed Seven Seas a fiduciary duty and that they were breaching that fiduciary duty.  *See JSC Neftegas-Impex v. Citibank, N.A.*, 365 S.W.3d 387, 411 (Tex. App. – Houston [1st Dist.] 2011, review denied).  Seven Seas must prove that CIBC "*intentionally* aided [the Directors] in what it *knew* was a breach of the latter's own fiduciary duty." *See id.* at 419 (emphasis in original).

Assuming, but not finding, for purposes of the aiding and abetting claim that the Directors breached their fiduciary duty to Seven Seas by entering into the Secured Financing,[27] the Court finds that Seven Seas has failed to prove that CIBC

---

[27]    The Directors settled the lawsuit filed against it by Seven Seas, Civil Action No. H-03-5693.  Based on the evidence at the trial in this case, however, the Court would find that Seven Seas has failed to prove that the Directors breached their fiduciary duty.  The Court credits LeFaive's testimony and other evidence presented at trial that all the Officers and Directors exercised their best judgment, and that Seven Seas benefitted from the Secured Financing.  The Directors were accomplished businessmen, and many of them had significant experience in the oil and gas industry.

(continued...)

*intentionally* assisted the Directors in what it *knew* was a breach of fiduciary duty. CIBC was retained to prepare a fairness opinion regarding whether the Secured Financing was fair to Seven Seas from a financial point of view. CIBC conducted an adequate investigation, given its limited role, and determined that the exchange of consideration in the Secured Financing was fair to Seven Seas from a financial point of view. It was not CIBC's role or duty to opine on the wisdom of the strategy of drilling the Deep Well. The Court finds that, even if the Directors were breaching their fiduciary duty to the Company, CIBC did not intentionally assist in what it knew was such a breach. CIBC is entitled to judgment on the aiding and abetting claim.

### B.   Conspiracy

To establish a civil conspiracy, the plaintiff must show that the defendant agreed on a goal or course of action, and that it or one of its co-conspirators committed an unlawful, overt act in furtherance of the goal or course of action. *Tri v. J.T.T.,* 162 S.W.3d 552, 556 (Tex. 2005). To prevail on its conspiracy to breach a

---

27      (...continued)
The Court would find that the terms of the Secured Financing were fully disclosed, that most shareholders were offered the opportunity to participate in the Secured Financing on the same terms as the Directors, and that the Secured Financing was pursued in a good faith attempt to carry out the Company's business plan and enable the Company to continue to exist. The Court would find that the Directors genuinely and reasonably believed they were acting in the best interest of the Company. Nonetheless, for purposes of the aiding and abetting and conspiracy claims, the Court assumes Seven Seas could prove that the Directors breached their fiduciary duty.

fiduciary duty claim, Seven Seas must prove that the Directors breached their fiduciary duty by entering into the Secured Financing.[28]  *See Meadows*, 492 F.3d at 640.   Civil conspiracy is an intentional tort, requiring proof that CIBC had "knowledge of the object and purpose of [the] conspiracy."  *See, Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 617 (Tex. 1996); *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex. 1968).  Indeed, to prevail on its civil conspiracy claim, Seven Seas must prove specific intent.  *See Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995).

Each former Director and CIBC representative who testified denied unequivocally that there was a conspiracy between CIBC and the Seven Seas Directors to breach any fiduciary duty.  Seven Seas has failed to present direct or circumstantial evidence (other than conjecture) to the contrary.  As a result, the Court credits the pertinent testimony and finds that Seven Seas has failed to prove that CIBC knew of any wrongful conspiracy among the Directors and willfully entered into it.

Seven Seas has also failed to prove that CIBC intended to conspire with the Directors to breach the latter's financial duties or intended to injure Seven Seas in any way.  CIBC prepared a Fairness Opinion that enabled Seven Seas to pursue its

---

[28]   Seven Seas bears the burden of proof on every element of its civil conspiracy claim.  *See Kelly v. Galveston Cnty.*, 520 S.W.2d 507, 515 (Tex. Civ. App. – Houston [14th Dist.] 1975).

publicly-announced business plan to drill the Deep Well.[29]  Although the possibility was small, the potential profit was immense if the drilling of the Deep Well were successful.  The Directors and senior management of Seven Seas – including those not alleged to have been involved in a conspiracy – genuinely believed drilling the Deep Well was in the Company's best interest.[30]  LeFaive testified that he believed the Secured Financing was a good deal for all parties, and that Seven Seas management was trying to do what they thought was in the Company's best interest.[31]  There is no evidence that the Directors or CIBC believed that obtaining the Secured Financing, through which the Company could continue to develop the then-successful Shallow Fields and drill the Deep Well, would bankrupt or otherwise harm the Company.  CIBC is entitled to judgment on the conspiracy claim.

---

[29]     As discussed throughout these Findings of Fact and Conclusions of Law, the Court finds that the Directors would have pursued the Secured Financing and the drilling of the Deep Well without CIBC's Fairness Opinion.  It is more likely than not that Seven Seas would have obtained a fairness opinion from Jefferies or another investment company.

[30]     Seven Seas argues that the failure of the Deep Well would inevitably bankrupt the Company, but that argument is not supported by the record.  The Officers and Directors believed, based in part on the Ryder Scott estimates, that the revenue generated by the Shallow Fields would sustain the Company.  LeFaive testified specifically that if the Ryder Scott estimates had been correct, Seven Seas would not have been bankrupt even if the Deep Well failed.

[31]     There is no allegation that LeFaive was a member of any conspiracy.

### C.    AMEX Letter and Sniper Report

Seven Seas argues that statements in the AMEX letter are evidence in support of the aiding and abetting and conspiracy claims.  The Court disagrees.  Plaintiff has failed to prove that the statements in the AMEX letter attributed to CIBC were false or intentionally misleading.  The Court credits LeFaive's testimony that there was never an effort to mislead the AMEX, and that the financial data (which came from his office) was not manipulated in any way.  The Court finds that the AMEX letter was intended to obtain an exception made necessary by the time constraints in the financing deal with Chesapeake.  The Court finds that it was not the purpose of the AMEX letter to deprive the shareholders of the right to vote on the Secured Financing, although the AMEX exception may have had that effect.

Seven Seas' argument that CIBC intentionally manipulated the financial projections in the Sniper Report is unpersuasive.  The Court finds specifically that CIBC did not intentionally manipulate the financial projections, or any other information in the Sniper Report, to aid and abet the Directors in breaching their fiduciary duty, or as part of a conspiracy between CIBC and the Directors.  CIBC used legitimate sources of information and assessed the possible value of the warrants under various scenarios.  CIBC did not undertake to and did not attempt to predict the

future success of Seven Seas.  Indeed, it is undisputed that the Sniper Report was not intended to be a fair market analysis of the Company.

The Court notes that Jefferies, a competitor of CIBC for the Seven Seas fairness opinion assignment, did not have access to the Sniper Report.  Nonetheless, Jefferies concluded independently that the Company was a "strong buy" based in part on the Secured Financing.  *See* Jefferies Analyst Report, CIBC Exh. 201.[32]  Jefferies concluded that the Company's capital structure was markedly improved by the Secured Financing.  *See id.*  Jefferies stated that Seven Seas owned "world class assets" that should receive greater attention, and commended the Chesapeake team for recognizing the Company's potential.  *See id.*

The Court finds that neither the AMEX letter nor the Sniper Report show the existence of a conspiracy between CIBC and the Directors to breach the Directors' fiduciary duty, or that CIBC aided and abetted the Directors in breaching their fiduciary duty.  CIBC is entitled to judgment on these two related claims.

---

[32]   Seven Seas objected to the Jefferies Analyst Report as inadmissible hearsay offered to prove that the Secured Financing was fair.  The Court has not considered the Jefferies Analyst Report for the truth of the matters asserted therein and, as a result, the statements are not hearsay.  *See* FED. R. EVID. 801(c)(2).  The Court is not finding, based on the Jefferies Report, that Seven Seas was actually a "strong buy" or that its capital structure had markedly improved after the Secured Financing.

## IV.   **FRAUD CLAIM**

Under Texas law, the elements of a fraud cause of action are: (1) a material representation was made; (2) it was false when made; (3) the speaker either knew it was false, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result.  *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 563 n.3 (5th 2002) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998)).  Seven Seas has failed to prove its fraud claim against CIBC.

The Court finds that Seven Seas has failed to prove that CIBC made statements in the Fairness Opinion that were false or intentionally misleading.[33]  Seven Seas argues that CIBC's statements that the Secured Financing was fair to the Company was false because CIBC knew the transaction was not fair, and was "bad for the Company, and likely would result in a dry hole and the demise of the Company." There is no evidence, however, that CIBC did not genuinely reach the opinions stated in the Fairness Opinion.

---

[33]   Plaintiff's counsel abandoned all bases for the fraud claim other than the written Fairness Opinion.

To the extent CIBC made any statements, rather than expressed an opinion, the statements were factually accurate, and the Court finds no credible evidence that CIBC intended to mislead anyone.  Seven Seas argues that CIBC falsely stated it relied on management projections, but actually combined inputs from various sources.  *See* Seven Seas Response to CIBC's Proposed Findings and Conclusions [Doc. # 274], p. 33.  The Court finds the argument unpersuasive.  CIBC's statement that it relied on company projections is not false simply because CIBC may have relied on other information also.  Additionally, Seven Seas has not explained persuasively why the statement regarding reliance on management projections is material.

To the extent statements in the Fairness Opinion were based on information provided by others, CIBC disclosed the extent of its reliance on such information.  To the extent any information provided by others was inaccurate, the Court finds no credible evidence that CIBC knew the information was not correct.

Moreover, Seven Seas has failed to prove reliance on any alleged misstatement of fact by CIBC.  To prevail on the fraud claim against CIBC, Seven Seas must prove actual reliance.  *See Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 411 (5th Cir. 2007).  To prove actual reliance, Seven Seas must prove that it was induced to act by its reliance on the truthfulness of the statement.  *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 501 n.8 (5th Cir. 2000).  Additionally, Seven Seas must

prove that its reliance on CIBC's alleged misrepresentations was justifiable.  *See Haralson v. E.F. Hutton Group, Inc.*, 919 F.2d 1014, 1025 (5th Cir. 1990) (applying Texas law).  "In an arm's-length transaction the defrauded party must exercise ordinary care for the protection of his own interests and is charged with knowledge of all facts which would have been discovered by a reasonably prudent person similarly situated.  And a failure to exercise reasonable diligence is not excused by mere confidence in the honesty and integrity of the other party."  *Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1962) (quoting *Courseview, Inc. v. Phillips Petroleum Co.*, 312 S.W.2d 197, 205 (Tex. 1957)).

Corporations such as Seven Seas can rely, or otherwise act, only through their human agents.  *See Bennett v. Reynolds*, 315 S.W.3d 867, 883 (Tex. 2010).  In the *Allstate* case, the Fifth Circuit reversed a verdict in favor of the plaintiff companies on a fraud claim where there was no evidence that any individual in the company relied on the alleged misrepresentations.  *See Allstate*, 501 F.3d at 411.  Unlike the cases cited by Seven Seas that are non-binding and involve pleading requirements in securities fraud cases, the *Allstate* case is binding on this Court.  The Court concludes that a corporate plaintiff asserting a common law fraud claim under Texas law must prove that a "human agent" actually relied on the alleged misrepresentations.

Seven Seas has failed to present evidence of any human agent of the Company, either director or officer, who relied on the accuracy of the Fairness Opinion. LeFaive testified that he was unaware of any Director who relied on the CIBC Fairness Opinion. Director Fuller testified that CIBC did not affect the Board's decisions. Director Randolph Devening testified that he did not even read the Fairness Opinion.[34] The Court accepts this testimony. The Court finds, based on the credible testimony presented at trial, that the decision to proceed with the Deep Well and the Secured Financing was made prior to CIBC's presentation of the Fairness Opinion. The Board viewed CIBC's issuance of a fairness opinion as a formality that would not alter the decision to drill the Deep Well, and the Board believed that a fairness opinion could be obtained from one of several other sources if CIBC declined to issue one. The Court finds that the Board's belief was more likely than not correct.

The Court finds that Seven Seas has failed to prove that CIBC made false representations that they knew were false or misleading and, moreover, has failed to prove that it relied on any allegedly false representations by CIBC. As a result, judgment on the common law fraud claim is entered in favor of CIBC.

---

[34]    Although Seven Seas relies exclusively on the written Fairness Opinion for its fraud claim, the Court notes that Devening was not present for CIBC's presentation of the Sniper Report at the May 17, 2001 Board meeting.

## V.   BREACH OF FIDUCIARY DUTY CLAIM

To prevail on a breach-of-fiduciary-duty claim under Texas law, the plaintiff must prove (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (3) resulting damages. *See Las Colinas Obstetrics–Gynecology–Infertility Ass'n v. Villalba*, 324 S.W.3d 634, 645 (Tex. App. – Dallas 2010, no pet.); *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App. – Dallas 2006, pet. denied); *Haynes v. Crescent Real Estate Equities, LLC*, 2012 WL 2574749, *9 (S.D. Tex. July 2, 2012) (Miller, J.).

Under Texas law, financial advisors such as investment banks generally do not owe a fiduciary duty to their clients.  *See, e.g.*, *Seven Seas Petroleum, Inc. v. CIBC World Markets Corp.*, 2010 WL 2277489, *6 (S.D. Tex. June 4, 2010); *In re e2 Commc'ns, Inc.*, 354 B.R. 368, 392–94 (Bankr. N.D. Tex. 2006).  A fiduciary duty may exist, however, where the relationship extends beyond a simple arms-length business transaction and becomes a special relationship of trust and confidence existing apart from the agreement made the basis of the suit.  *See Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 288 (Tex. 1998); *W. Reserve Life Assurance Co. v. Graben*, 233 S.W.3d 360, 373-74 (Tex. App. – Fort Worth 2007, no pet.).

Seven Seas argues that CIBC owed it a fiduciary duty because it acted as the Company's "exclusive financial advisor" and "assumed the role of gatekeeper and

facilitator" for the Secured Financing.  *See* Seven Seas' Response to CIBC's Proposed Findings and Conclusions [Doc. # 274], p. 30.  As discussed in the Background Findings of Fact section, the Court finds that CIBC's assignment as of March 2001 was to provide a fairness opinion, not to be the exclusive financial advisor to Seven Seas generally.  The Court finds also that CIBC was hired to provide a fairness opinion, not to serve as a "gatekeeper and facilitator" for the Secured Financing as Seven Seas contends.  In fact, CIBC's role was limited to giving an opinion as to whether the Secured Financing was fair to Seven Seas from a financial point of view. CIBC was not retained to give business advice or to opine regarding whether the Secured Financing was in the Company's best interest.

Moreover, Seven Seas has failed to present evidence that CIBC had a special relationship of trust and confidence that existed prior to and apart from its agreement to provide a fairness opinion in connection with the Secured Financing.  As a result, Seven Seas has failed to prove that CIBC owed it a fiduciary duty and judgment on this claim is entered in favor of CIBC.

## VI.   GROSS NEGLIGENCE CLAIM[35]

Seven Seas alleges that CIBC was grossly negligent in its representations to the AMEX, in presenting "a deeply flawed Sniper Report," and in issuing a false fairness opinion without considering alternative options.  *See* Seven Seas' Response to CIBC's Proposed Findings and Conclusions [Doc. # 274], pp. 35-36.  "Gross negligence consists of both objective and subjective elements."  *U-Haul Intern., Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012) (citing *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001)).  The plaintiff must prove "*by clear and convincing evidence* that (1) when viewed objectively from the defendant's standpoint at the time of the event, the act or omission involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others and (2) the defendant had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others."  *Id*. (citing TEX. CIV. PRAC. & REM. CODE § 41.001(11); *State v. Shumake*, 199 S.W.3d 279, 287 (Tex. 2006)) (emphasis added).  "Under the objective component, 'extreme risk' is not a remote possibility or even a high probability of minor harm, but rather the likelihood of the plaintiff's serious injury."  *Id*. (citing *Mobil Oil Corp. v. Ellender*, 968 S.W.2d

---

[35]   Seven Seas' gross negligence claim is time-barred.  Nonetheless, for purposes of a complete record, the Court alternatively issues findings of fact and conclusions of law on the merits of the claim.

917, 921 (Tex. 1998); *Harrison*, 70 S.W.3d at 785).  The second, subjective element "requires that the defendant knew about the risk, but that the defendant's acts or omissions demonstrated indifference to the consequences of its acts."  *Id.* (citing *La.-Pac. Corp. v. Andrade*, 19 S.W.3d 245, 246-47 (Tex. 1999); *Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (Tex. 1993)).

Seven Seas has failed to prove by clear and convincing evidence that CIBC was grossly negligent.  The Court finds that statements in the AMEX letter attributable to CIBC were correct.  Moreover, the Court finds that CIBC was not aware of an "extreme risk" of financial ruin to Seven Seas that was likely to result from CIBC's statements in the AMEX letter.

With reference to the Sniper Report and the Fairness Opinion, Seven Seas has similarly failed to prove gross negligence by clear and convincing evidence.  No former Director or Officer of Seven Seas has testified that CIBC's work on the Sniper Report or the Fairness Opinion was deficient.  The Court finds that CIBC conducted an adequate investigation of alternative sources of financing.  The Court finds that Seven Seas' evidence does not support its position that CIBC was aware that the Sniper Report and Fairness Opinion were likely to result in the financial ruin of Seven Seas.  To the extent that Seven Seas relies on the testimony of Loretta Cross to support its gross negligence claim, the Court finds that Cross's analysis and testimony lacked

sufficient grounding in the standards applicable to investment banking fairness opinions and was not persuasive.[36]

The Court does not suggest that CIBC's work giving rise to the Sniper Report and Fairness Opinion was a model of quality investment banking work. Nevertheless, Seven Seas has not met its burden to show that any analytical omissions or weaknesses constitute proof necessary to establish by clear and convincing evidence that CIBC's work and its conclusions were grossly negligent. As a result, CIBC is entitled to judgment on Seven Seas' gross negligence claim.

## VII.  **DAMAGES**

Seven Seas seeks to recover direct and consequential damages it claims resulted from CIBC's misconduct. Seven Seas also seeks to recover punitive damages. CIBC argues that any damages awarded to Seven Seas are subject to a setoff of $17,287,000.00 already paid to Seven Seas by various Directors and by McAfee & Taft. The Court has found that Seven Seas failed to prove any of its claims for relief. Nonetheless, the Court addresses the damages issues for purposes of a complete record.

---

[36]     Cross's work contained material analytical and mathematical errors.

### A.    Direct and Consequential Damages

Seven Seas argues correctly that, in breach of fiduciary duty cases, "litigants and courts must be flexible and imaginative in calculating the proper measure of damages." *See* Seven Seas' Response to CIBC's Proposed Findings and Conclusions [Doc. # 274], p. 38 (citing *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 487 (5th Cir. 2000)).  The Fifth Circuit in *Taylor* stated further, however, that "the fact that a flexible approach to the measurement of damages was necessary does not excuse the need for [Plaintiff] to offer evidence" of causation.  *See Taylor*, 216 F.3d at 487.  As a result, the Court concludes that Seven Seas would be entitled to recover only those damages it can prove were caused by CIBC's allegedly wrongful conduct.

Seven Seas seeks to recover $53.4 million in damages for the lost value in the Company.  Specifically, Seven Seas seeks the difference between the fair market value of its core assets in mid-2001 and the proceeds from the 2003 liquidation in connection with the bankruptcy proceeding.  Additionally, Seven Seas seeks to recover the $24 million spent to drill the Deep Well.  Seven Seas' theory for these elements of damage is that CIBC's participation in obtaining the AMEX exception and issuing the Fairness Opinion[37] enabled Seven Seas to enter into the Secured

---

[37]    It bears repeating that the Court has found that Seven Seas failed to prove that CIBC is liable for conduct in connection with the AMEX exception, its Sniper Report, or its Fairness Opinion.  There is no material falsity in what CIBC said.

Financing that provided the funds to drill the Deep Well, knowing that the Company was "doomed" if the Deep Well was a failure.  *See* Seven Seas Supplemental Proposed Findings and Conclusions [Doc. # 267], pp. 62-63.  The Court finds that Seven Seas' damages theory is impermissibly based on "20/20 hindsight."

The Court is entirely unpersuaded that Seven Seas has shown causation for its claimed damages.  As Atherton explained during his testimony, Seven Seas' injury was the result of its business plan, that was based in part on inaccurate projections from Ryder Scott and others.  The Directors had committed, well before CIBC was retained in 2001, to drill the Deep Well.  CIBC did not participate in this decision and the Court concludes that CIBC would not be responsible for the resulting losses incurred by the Company.

Seven Seas argues correctly that the Company needed a fairness opinion to complete the Secured Financing.  As discussed more fully above, CIBC has presented evidence that Seven Seas more likely than not would have obtained a fairness opinion from Jefferies or a different investment company if CIBC had declined to issue one. Seven Seas has presented no evidence to the contrary.  Moreover, Seven Seas has not proven that CIBC's Fairness Opinion (or the Sniper Report) were materially false or the result of gross negligence or of a wrongful conspiracy.  As a result, the Court finds that Seven Seas has failed to prove that CIBC's Fairness Opinion caused Seven Seas

to obtain the Secured Financing.[38]  Consequently, Seven Seas' underlying damages theory is rejected as unsupported by the evidence.

Additionally, Seven Seas has failed to prove that CIBC's allegedly wrongful conduct, and the resulting Secured Financing, caused the Company to lose value. Seven Seas argues that CIBC's participation in obtaining the AMEX exception and CIBC's Fairness Opinion allowed Seven Seas to close the Secured Financing and, thereby, caused the value of the Shallow Fields to decrease from mid-2001 until they were the subject of a "fire sale" during the bankruptcy proceeding in 2003.  The Court finds that Seven Seas has not satisfied its burden to prove the actual fair market value of the Shallow Fields in mid-2001 or that the Company would have sold its assets for that price.  Seven Seas' valuation is based on the Ryder Scott estimate of the Company's reserves in the Shallow Fields in mid-2001.  It is undisputed that Ryder Scott significantly reduced its estimate of those reserves in 2002 as a result of events entirely unrelated to the drilling decisions by the Company.  Seven Seas has presented no evidence of any party in 2001 that was interested in buying the Shallow Fields for $84 million, the amount Seven Seas claims was the fair market value at that time. More importantly, it is undisputed that the Directors and senior management of Seven

---

[38]     Seven Seas failed to prove that the CIBC's Fairness Opinion caused the Company to obtain the Secured Financing.  Having failed to prove CIBC caused the Secured Financing, Seven Seas has similarly failed to prove CIBC caused Seven Seas to use the funds from the Secured Financing to drill the Deep Well.

Seas in 2001 were not, under any circumstances, willing to sell the Shallow Fields but, instead, were determined to continue to develop those properties.  Selling the Shallow Fields would have been contrary to Seven Seas' business plan that had been provided to investors, the Securities and Exchange Commission, and the public.  Indeed, sale of the Shallow Fields would have amounted to virtually a liquidation of the Company's only performing asset.  There is no credible evidence in the record that the Company would have sold this asset in 2001.[39]

Seven Seas has similarly failed to prove that CIBC's allegedly wrongful conduct caused the Company to spend $24 million drilling the Deep Well.  As discussed above, the decision to drill the Deep Well was made years before CIBC was hired in March 2001, was made without input from CIBC, and was publicly disclosed in the Company's business plan.  Indeed, it is uncontroverted that if Seven Seas had decided not to drill the Deep Well contrary to its longstanding publicly-disclosed plans, it may well have been sued for fraud and breach of fiduciary duty.  Seven Seas has failed to prove the necessary causal connection between CIBC's challenged conduct and the decision to drill the Deep Well.

---

[39]    The Court notes that it was the Company's decision in late 2002 to sell the Shallow Fields that caused Seven Seas' bondholders to file the involuntary bankruptcy petition.

In summary, Seven Seas' claimed compensatory damages are speculative. The claimed damages are not supported by evidence of causation between CIBC's challenged conduct and either the Company's lost value (based on the value of the Shallow Fields as argued by Seven Seas in this lawsuit) or the funds spent to drill the Deep Well. Seven Seas does not seek any other element of compensatory damages.[40]

## B.    Exemplary Damages

Seven Seas is not entitled to an award of compensatory damages because it failed to prove any of its claims in this case, because it failed to prove causation regarding its claimed damages, and because it failed to prove it suffered damages in the amount claimed. As a result, Seven Seas is not entitled to an award of exemplary damages. *See* TEX. CIV. PRAC. & REM. CODE § 41.004(a) ("exemplary damages may be awarded only if damages other than nominal damages are awarded"). If it were required to reach this issue, the Court would not in any event award exemplary damages in this case.

Under Texas law, "exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the

---

[40]    Atherton testified that if the Court found that Seven Seas were entitled to recover damages from CIBC in this case, the only damages attributable to CIBC would be the present value of the difference between the 12% interest rate in the Secured Financing and the 9.6% interest rate calculated by Brickley, Seven Seas' expert, over the life of the loan. Seven Seas did not, however, request this as an element of its damages. Had it done so, the Court would credit Atherton's testimony on this issue.

claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence." TEX. CIV. PRAC. & REM. CODE § 41.003(a). For the reasons stated above, the Court concludes that Seven Seas failed to prove by clear and convincing evidence that CIBC was grossly negligent. Seven Seas also failed to prove its fraud claim by a preponderance of the evidence. *A fortiori*, there is a failure to prove fraud by clear and convincing evidence. The Court finds no credible evidence that CIBC acted with malice toward Seven Seas. As a result, Seven Seas is not entitled to an award of exemplary damages.[41]

---

[41]    Setoff is not an issue in this case because Seven Seas is not awarded compensatory damages. The Court nonetheless notes that during a hearing in this case, Seven Seas' counsel conceded that CIBC would be entitled to a setoff for amounts paid to Seven Seas in settlements in the Directors Litigation and, in post-trial briefing, agrees that CIBC would be entitled to a standard setoff for any damages awarded for claims to which the Texas proportionate liability statute does not apply.

The Texas proportionate responsibility statute provides: "[i]f the claimant is not barred from recovery under Section 33.001, the court shall reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a percentage equal to the claimant's percentage of responsibility." TEX. CIV. PRAC. & REM. CODE § 33.012(a). As explained below, the Court holds in this case that Seven Seas' proportionate responsibility is greater than 50% and, therefore, it is barred from recovery under § 33.001. Should it later be determined that Seven Seas' proportionate responsibility is less than 50%, its percentage of responsibility would first be deducted from the total amount of damages, resulting in a proportionately reduced total damage figure.

Next, "[i]f the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by the sum of the dollar amounts of all settlements." TEX. CIV. PRAC. & REM. CODE § 33.012(b). Therefore, the settlement amounts received by Seven Seas
(continued...)

## VII.   RESPONSIBLE THIRD PARTIES

The Court has determined that Seven Seas has failed to prove its claims against CIBC, and has failed to prove any damages caused by CIBC.   Because CIBC designated responsible third parties pursuant to Texas law, for purposes of a full record, the Court addresses the proportionate responsibility issue.

Section 33.004 of the Texas Civil Practice and Remedies Code provides that "[a] defendant may seek to designate a person as a responsible third party by filing a motion for leave to designate that person as a responsible third party."   Under § 33.011(6) of the Texas Practice & Remedies Code, a "responsible third party" "means [in pertinent part] any person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or activity that violates an applicable legal standard, or by any combination of these."   *See also Werner v. KPMG LLP*, 415 F. Supp. 2d 688, 702-03 (S.D. Tex. 2006); *Cortez v. Frank's Casing Crew & Rental Tools*, 2007 WL 419371 (S.D. Tex. Feb. 2, 2007).   By Order [Doc. # 164] entered July 25, 2012, the Court allowed CIBC to designate the following as responsible third parties:

---

[41]        (...continued)
in the Directors Litigation would be subtracted from the proportionately reduced amount.   At that point, CIBC would be liable for its proportionate responsibility of any remaining amount of damages.

- Robert Hefner, III, Gary Fuller, Brian Egolf, Dr. James Schlesinger, Larry Ray, Randolph Devening, James Panero (collectively, "Officers and Directors");

- McAfee & Taft, Jerry Warren, and Gary Fuller (collectively, Seven Seas' Counsel);

- Ramiiilaj Limited Partnership, Petroleum Properties Management Company, and Fuller Family Investments Limited Partnership (collectively, the "Investment Vehicles/Affiliates");

- Chesapeake Energy Corporation,

- The Ryder Scott Company;

- DeGolyer and MacNaughton; and

- Dr. Jay Namson and Davis and Namson Consulting Geologists (collectively, "Namson").

If an individual or entity is held to be a responsible third party, then § 33.003 of the Texas Civil Practice & Remedies Code provides that the person is to be included in the list of parties the factfinder may consider for allocation of responsibility for the plaintiff's damages.  Thus, designation of a responsible third party could affect the amount of a plaintiff's recovery because a defendant "is liable to a claimant only for the percentage of damages found by the trier of fact equal to that defendant's percentage of responsibility with respect to the . . . harm for which the damages are allowed."  TEX. CIV. PRAC. & REM. CODE § 33.013(a).  CIBC is liable only for the percentage of damages equal to its percentage of liability compared to other designated responsible parties.  *See id.*  If Seven Seas' own responsibility is

greater than fifty percent (50%), it is barred from recovery.  *See* TEX. CIV. PRAC. & REM. CODE § 33.001.[42]

Seven Seas argues that Chapter 33's proportionate responsibility provisions do not apply to the claim that CIBC aided and abetted a breach of fiduciary duty or to the claim that CIBC conspired to breach a fiduciary duty.  This argument is unfounded.  The statute provides that it applies to "***any cause of action based on tort*** in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought."  TEX. CIV. PRAC. & REM. CODE § 33.002(a) (emphasis added).  The statute then lists those claims to which it does not apply.  *See* TEX. CIV. PRAC. & REM. CODE § 33.002(c).  The Court concludes that the statute applies to all tort claims except those specifically excluded.  *See Pemex Exploracion y Produccion v. BASF Corp.*, 2011 WL 9523407, *12-*13 (S.D. Tex. Oct. 20, 2011) (Lake, J.).  As noted by the district court in *Pemex*, citing the Texas Supreme Court, "[w]hen the Legislature has chosen to impose joint and several liability rather than proportionate liability, it has clearly said so."  *Id.* (quoting *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 690-91 (Tex. 2007)).  As a

---

[42]     "In an action to which this chapter applies, a claimant may not recover damages if his percentage of responsibility is greater than 50 percent."  TEX. CIV. PRAC. & REM. CODE § 33.001.

result, the Texas proportionate responsibility statute applies to all claims asserted by Seven Seas in this case.[43]

If the Court were required to reach damages issues, it would find that Seven Seas has failed to prove that its Officers and Directors breached their fiduciary duties or conspired with CIBC to do so.  For purposes of a complete record, the Court would find, if required to decide, that the Officers and Directors – including those who were disinterested – were primarily responsible for Seven Seas' damages.  It is inescapable (despite Seven Seas' counsel's denials) that the Officers and Directors, acting in their official corporate capacities, made the business decisions to insist on exploration and drilling of the Deep Well in the Guaduas Fields and to enter into the Secured Financing.  These business decisions were made by the Officers and Directors independently and without input from CIBC.  The Court would assign significantly more than 50% of the responsibility for Seven Seas' alleged damages to the Company acting through its Officers and Directors.  Because it bears more than 50%

---

[43]      Breach of fiduciary duty is a tort under Texas law.  *See Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 518 (Tex. App. [1st Dist.] 2012, *pet. dismissed*); *Broussea v. Ranzau*, 81 S.W.3d 381, 398 (Tex. App. – Beaumont 2002, *review denied*).  "When a third party knowingly participates in the breach of a fiduciary duty, the third party becomes a joint tortfeasor and is liable as such." *James J. Flanagan Shipping Corp. v. Del Monte Fresh Produce N.A., Inc.*, __ S.W.3d __, 2013 WL 941797 *7 (Tex. App. – Houston [1st Dist.] 2013) (citing *JSC Neftegas–Impex v. Citibank, N.A.*, 365 S.W.3d 387, 411 (Tex. App. – Houston [1st Dist.] 2011, *pet. denied*) (quoting *Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571, 580 (Tex. App. – Dallas 2007, *no pet.*)).

responsibility for its alleged damages, Seven Seas is not entitled to recover any of its alleged damages in this lawsuit.

Seven Seas argues that the proportionate responsibility of its Officers and Directors should not be imputed to the Company because they and CIBC conspired to defraud the Company.  As discussed above, the Court finds that CIBC did not conspire with the Seven Seas Officers and Directors in any breach of their fiduciary duties.

## IX.   <u>CONCLUSION</u>

Based on the foregoing Findings of Fact and Conclusions of Law, the Court finds that CIBC was retained to provide only a Fairness Opinion and was not Seven Seas' exclusive financial advisor for all purposes.  The Court finds that the statements in the AMEX letter, the Sniper Report, and the Fairness Opinion were not false or intentionally misleading.  CIBC's work for Seven Seas, while far from perfect, was not fraudulent or grossly negligent.  The Court concludes without reservation that CIBC did not aid and abet, or knowingly enter into a conspiracy regarding, any breach of fiduciary duty by the Directors.

The Court will enter judgment in favor of Defendant CIBC on all claims. Taxable costs are assessed against Plaintiff.

The Court will issue a separate Final Judgment.

SIGNED at Houston, Texas, this **19th** day of **July, 2013**.

Nancy F. Atlas
United States District Judge